UNITED STATES of America,
Appellee,

v.

Richard HUSS, Appellant.

UNITED STATES of America,
Appellee,

v.

Sheldon SEIGEL, Appellant.

UNITED STATES of America,
Appellee,

v.

Jeffrey H. SMILOW, Appellant.

Nos. 1087, 1099 and 1103, Dockets
73–1920, 73–1931 and 73–1945.

United States Court of Appeals,
Second Circuit.

Argued June 12, 1973.

Decided June 26, 1973.

Alan M. Dershowitz, Cambridge, Mass. (Harvey A. Silverglate, Norman S. Zalkind, Zalkind & Silverglate, Jeanne Baker, Boston, Mass., on the brief), for appellant Seigel.

Arthur H. Miller, Brooklyn, N. Y., for appellant Huss.

Robert P. Leighton, New York City, for appellant Smilow.

Henry Putzel, III, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y. and Joseph Jaffe, Asst. U. S. Atty., on the brief), for appellee.

Before KAUFMAN, Chief Judge, SMITH, Circuit Judge, and BRYAN *, District Judge.

IRVING R. KAUFMAN, Chief Judge:

On January 26, 1972, a bomb exploded in the New York City offices of Columbia Artists Management, Inc., and in the offices of the internationally renowned impresario Sol Hurok, also in New York City. One life was lost, that of Iris Kones, as a result of these senseless and cowardly acts of violence. On June 19, 1972, Stuart Cohen, Sheldon Davis and Sheldon Seigel were indicted in the Southern District of New York for the bombing and charged with violations of 18 U.S.C. §§ 844(i) and 2.[1] A supersed-

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. 18 U.S.C. § 844(i) provides:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

18 U.S.C. § 2 provides:

§ 2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

ing indictment, filed on July 3 and sealed until December 8, 1972, charged the original three defendants and a fourth, Jerome Zellerkraut, with the two counts noted above, and, in addition with conspiracy, and the unlawful possession of explosive devices, 26 U.S.C. §§ 5845(a)(8) and (f), 5861(d) and 5871.

On February 2, 1973, three days before the expected commencement of the trial in the district court, the government moved to sever Sheldon Seigel from the trial on the grounds that Seigel was a government informer who had provided information leading to the indictments, that he had testified before the grand jury, and that he would be called as a witness at trial, under a grant of immunity. Seigel, through his counsel, moved for an order preventing the government from calling him as a witness on several, at once independent and connected, grounds—some novel, all complex. In essence, Seigel objected to any questions the government intended to ask him which were based on information gleaned from illegal electronic surveillance and violations of his constitutional rights. Pursuant to 18 U.S.C. § 3504(a)(1),[2] the government affirmed the existence of illegal F.B.I. wiretapping involving Seigel. Accordingly, in response to Seigel's motion, the district judge commenced a taint hearing to determine the validity of Seigel's claims.[3] On April 25, 1973, Judge Bauman denied the motion for a protective order and filed a careful, thorough and knowledgeable opinion in support of his decision.

Trial commenced on May 30 and, on the following day, Sheldon Seigel was called as the government's first witness. Apart from stating his name and address, Seigel refused to answer questions posed to him by the Assistant United States Attorney, and persisted in his refusal even after being ordered to answer by the court. Seigel was held in civil contempt, pursuant to 28 U.S.C. § 1826(a),[4] and was released on bail. After the following witness, Richard Huss, was called, but before a question was put to him, Judge Bauman adjourned the trial for one week, during which time the government was directed to determine whether the Central Intelligence Agency had conducted electronic surveillance of several persons involved in the

2. 18 U.S.C. § 3504(a)(1) provides:
§ 3504. Litigation concerning sources of evidence.
(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—
(1) Upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;
§ 3504(b) provides:
(b) As used in this section "unlawful act" means any act the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.

3. Defendants Cohen and Davis also made certain motions which the district judge considered during the course of the hearings. These motions are not under review at the present time.

4. 28 U.S.C. § 1826(a) provides:
§ 1826. Recalcitrant witnesses
(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—
(1) the court proceeding, or
(2) the term of the grand jury, including extensions,
before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

case and to so advise the court. On June 8, 1973, the government denied the existence of such electronic surveillance as to Seigel and all others involved in this case. It then agreed to vacate the outstanding order of civil contempt against Seigel, recalled him to the stand, conferred immunity upon him, and once again questioned him with respect to the Hurok bombing. Seigel refused to answer, in defiance of an order to do so by the trial judge, and was again held in civil contempt. Release on bail followed once more. Richard Huss and Jeffrey Smilow were then called to testify as witnesses and, despite grants of use-immunity, they too refused to testify. They were held in civil contempt and committed to a federal detention center for a period not to exceed the duration of the court proceedings, but in no event in excess of eighteen months, or until they themselves decided to unlock the jailhouse door by agreeing to testify. 28 U.S.C. § 1826(a). Thus far, they have not chosen to do so.

These three judgments of civil contempt, dated June 8, 1973, form the basis of this expedited appeal. By statute, an appeal from an order of confinement for civil contempt must be disposed of as soon as practicable, and in no event later than thirty days from the filing of such appeal, 28 U.S.C. § 1826(b). The need for a speedy decision in this case is especially compelling because the trial, with the jury empaneled, currently stands in adjournment. The government has stated that its entire prosecution depends upon the testimony of these three reluctant witnesses—Seigel, Huss and Smilow—and that without their assistance, compelled or otherwise, the prosecution will be dismissed. The court, mindful of its ultimate responsibility, has expedited its decision by devoting its attention almost exclusively to this appeal.

I.

A few prefatory remarks on the posture of the case before us are appropriate. The legal issues involved in this appeal are set in a context that unfortunately highlights the seamiest aspects of the criminal law and its enforcement. Although the facts with respect to the criminal charge currently pending before Judge Bauman have as yet not been determined, the indictment concerns the commission of crimes which already have taken a grievous toll—the loss of a human life. The hearings conducted by the able district judge revealed the existence of two sets of F.B.I. wiretaps, which the government concedes lack any legal authorization. Judge Bauman also concluded that an automobile search involved in this case, conducted by New York City police, violated the Fourth Amendment. It was the court's judgment that the government's version of what had actually occurred in connection with the car search, "strain[ed] common sense" and was "patently unbelievable." The case also involves the use of an informer, always unpleasant business despite the conceded importance of informers for the administration of criminal justice. Given this context it should hardly be surprising to learn that the informer, Sheldon Seigel, adopted some of the tactics of those with whom he associated and himself surreptitiously recorded many conversations with a New York City detective to whom he reported, and on at least one occasion, even with an Assistant United States Attorney. Thus in the midst of so much deceit and lawlessness, we are called upon to render a decision that serves the cause of justice. When, under such circumstances, the court, as an engine in the pursuit of truth, is compelled to decide which of the two competing parties is more unbelievable, that engine is put under extraordinary strains in its effort to keep its commitment to the rule of law. In such instances, courts quite understandably would prefer to avoid any choice at all. Since this option is foreclosed to us, we proceed to a resolution of the issues presented.

## II.

It is appropriate that Sheldon Seigel, the focus of so much investigative attention, and the principal subject of inquiry during the hearings conducted by the district judge, should occupy center-stage in this opinion. We shall discuss and decide his claims first and then proceed to a consideration of the Huss and Smilow appeals.

28 U.S.C. § 1826(a), the statutory provision under which Seigel was held in civil contempt, authorizes such contempt when a witness refuses, *inter alia,* to comply with an order of a court to testify, "without just cause." It is Seigel's assertion that he had ample just cause to withhold his testimony. Briefly stated, Seigel's view is that questions which the government proposed to ask him in connection with the Hurok bombing derive from unlawful government electronic surveillance involving interception of his conversations at the Brooklyn offices of the Jewish Defense League and at his home. Furthermore, Seigel asserts that in connection with information discovered by means of illegal electronic surveillance, the government was enabled to elicit facts from him during his "informer" period, because of a massive invasion of his constitutional rights. In sum, his contention is that, in one way or another, he was coerced or pressured into cooperation with government officials, that such pressure stemmed directly from illegal wiretapping and ancillary constitutional violations, and that all prosecution questions asked at trial are tainted and, therefore, subject to suppression. With this summary in mind,[5]

we proceed to a discussion of the facts which are relevant to our decision.

In October, 1970, acting solely under a direction of then Attorney General John Mitchell, the F.B.I. installed a so-called domestic security wiretap on the New York office of the Jewish Defense League. The surveillance, conducted without judicial sanction, continued until July 2, 1971. The government concedes that these taps were unlawful. It tells us that the tapes of this surveillance were destroyed, a fact not without significance, but that summary logs of the tap disclosed that Seigel had been overheard on six occasions.

On April 22, 1971, while the F.B.I.'s JDL tap was in operation, a bomb exploded at the offices of the Amtorg Trading Corporation, the home of the Russian Trade Mission in New York. A New York City Police Department investigation of this bombing, which we shall discuss at greater length in a subsequent portion of the opinion, led ultimately to physical surveillance of Sheldon Seigel, commencing on June 3, 1971, which in turn resulted in Seigel's arrest the following day, in a Manhattan parking garage. At that time, Seigel's car was searched—illegally as the trial judge concluded. The search disclosed fragments of wire, several pieces of plastic, a can of mace, a small film capsule filled with gunpowder, a cardboard tube with an attached fuse and ten empty alarm clock boxes. Seigel's automobile was impounded, and on June 29, 1971, he was indicted, on state charges, for possession of explosives.

---

5. On appeal, Seigel argues that the failure of the district judge to order the government to affirm or deny whether his voice was overheard by electronic surveillance conducted by various intelligence agencies under the control of the White House, the military or other agencies, when requested to do so on May 31, and June 8, 1973, was error. He also argues that he was justified in refusing to testify on the ground that the use-immunity afforded to him under 18 U.S.C. § 6002 and § 6003, was not coextensive with his privilege against self-incrimination, citing a recent case, In re Baldinger, 356 F.Supp. 153 (C.D.Cal. March 14, 1973), 13 Crim.L. Rep. 2029, and Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) ; *but see* Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In view of our disposition of Seigel's other claims, we need not reach these questions.

The district judge's opinion relates the following subsequent events:

> Seigel repeatedly tried to obtain the return of his car, without success. During these efforts he came in contact with a number of law enforcement officials, among whom were: Melvin Glass, then an Assistant District Attorney for New York County, now a judge of the New York City Criminal Court; Thomas Pattison, an Assistant United States Attorney for the Eastern District of New York; Michael LaPerch of the Alcohol and Firearm Division of the U. S. Treasury Department; and Detectives Santo Parola and Joseph Gibney of the New York City Police Department. All of these men, especially Parola, who was to develop a close and continuing relationship with Seigel, attempted to induce him to cooperate with various law enforcement authorities in their investigation of the activities of the Jewish Defense League, particularly with reference to the bombing of the offices of the Amtorg Trading Corporation on April 22, 1971.

These discussions between Seigel and government officials were conducted in the absence of his attorney, Harvey Michaelman, Esq., one of the many attorneys who had volunteered their services to the JDL, who had been retained by Seigel shortly after his arrest on June 4. On approximately August 9, 1971, Detective Parola arranged for the return of Seigel's car. Shortly thereafter, Seigel admitted that he had participated in the Amtorg bombing and agreed to cooperate in the official investigation of JDL activities. The circumstances leading to this agreement merit some discussion.

During his direct testimony at the taint hearing, Detective Parola stated that he had become familiar with the type of explosive device used in the Amtorg bombing when one such bomb, which did not explode, was dismantled by a member of the police department's bomb unit.

Analysis disclosed that wire seized from Seigel's car and wire used in making the Amtorg bomb were similar. Parola testified—and we note that this testimony was given prior to a finding by the district judge as to the illegality of the car search—that he, and his partner Detective Gibney, met with Seigel some time during the summer of 1971. In Parola's words: "We drove up and we did speak to him in the car at that time and we explained to him that we did find the wire in his car, and the gloves, and we did find—we did trace component parts like the micronta timer that was bought in the store in his neighborhood, and we related certain facts to thim [sic] that we did have available that led us to believe that he was one of the people who made that bomb." In describing Seigel's response, Parola said: "At that time he just sort of looked at us in amazement, and he said, 'How can I believe that this is true?' And we said, 'You can take our word for it, we do have it, you know it was in the car, you saw it was in the car.'" Parola related a subsequent conversation which apparently occurred after the return of Seigel's car, in which he said: ". . . we referred to the fact that we would like him to give us a hand on the Amtorg case after telling him about the fact that we did remove the wire, and we went into that phase of our investigation, that most of the wire and the gloves, and whatever we found in his car pointed to him as being one of the perpetrators."

On September 8, 1971, approximately one month after Seigel's agreement to cooperate with Parola, he was indicted by a federal grand jury in the Eastern District of New York for the Amtorg bombing. His "cover" was thus protected. Although Assistant United States Attorney Pattison, who was in charge of the prosecution, had stated in a note, given by him to Parola and then by him to Seigel, that Seigel would be given immunity in the Amtorg case, it is unclear whether Seigel knew that he could not

be prosecuted under any circumstances, or believed only that he would not be prosecuted if he continued to cooperate with government officers. On one occasion Seigel indicated to Pattison that he wished to discuss his cooperation and the question of immunity with his attorney, Michaelman, but Pattison advised against it. Parola, by his own testimony, stated that he repeatedly advised Seigel not to discuss the question with Michaelman, or at least to get a lawyer who would be independent of the JDL. In any event, naming Seigel as a defendant in the Amtorg case prevented immediate disclosure of his informer status, a situation which served both the government's and Seigel's interests.

Thereafter, Seigel continued to speak frequently with Parola and Gibney, and to provide information concerning planned JDL activities against Soviet officials and offices. On December 15, 1971, however, without Seigel's knowledge, the government initiated warrantless electronic surveillance on his home telephone, and the F.B.I. overheard many of his conversations. The surveillance, whose illegality is conceded by the government, was maintained through March 1, 1972. The dates, of course, are highly significant, at least in Seigel's eyes, inasmuch as the span embraces the date of the Hurok bombing, January 26, 1972. The tapes of these interceptions were also destroyed by the government. After the Hurok incident, Parola attempted to elicit information from Seigel regarding JDL involvement in the affair. It was not until May 7, 1972, however, that Seigel disclosed to Parola the names of the participants in the Hurok and Columbia bombings including his own. It is but another indication of the furtive and devious character of those who engage in these diabolical activities that Seigel himself had participated in the Hurok and Columbia bombings, even while serving as a vital government informer.

### III.

At the threshold, we must consider whether Seigel should not have been permitted to raise the issues of illegal electronic surveillance and unlawful invasion of his constitutional rights, as a defense of "just cause" in refusing to answer questions during a criminal proceeding.

We need not tarry over the question whether Seigel has standing to object to questions on the basis of wiretap taint, despite his posture as a witness and not a defendant in a criminal prosecution. The government concedes that such standing is conferred by statute, see 18 U.S.C. §§ 2510(11), 2515 and 2518(10), and inasmuch as the Supreme Court reached the same conclusion with respect to the more difficult question of a grand jury witness's standing, see Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), we believe the rule applies a fortiori to this case.

The district judge also concluded that Seigel had standing to object to questions based on violations of his constitutional rights, relying upon a recent decision of the Court of Appeals for the Sixth Circuit in United States v. Calandra, 465 F.2d 1218 (1972), cert. granted 410 U.S. 925, 93 S.Ct. 1357, 35 L.Ed.2d 585 (February 21, 1973), which extended the rationale of Gelbard to immunized grand jury witnesses who raise Fourth Amendment—other than wiretap—claims as a justification of their refusal to testify. Although in Gelbard the Supreme Court left open the question decided in Calandra, see 408 U.S. 41, 45, n.5, 92 S.Ct. 2357, 33 L.Ed.2d 179, the district judge concluded that "[to] rule otherwise would permit the government, when it has obtained evidence illegally, to confer immunity on a defendant and then circumvent the effect of the exclusionary rule by prosecuting him for contempt." The government contends that Calandra was wrongly decided. We need not decide the question, however, since the issue here is not so much one of standing to raise independent constitutional claims—as in Calandra—but rather the evidentiary relevance of the alleged constitutional

violations to the issue of wiretap taint. We can hardly say that the district judge abused his discretion in expanding the scope of the hearing. The problem before Judge Bauman, as he viewed it, involved analysis of a chain of evidence. In his words:

The causal linkage [between illegal official activities] he [Seigel] perceives may be summarized as follows. The government first focused upon Seigel as a suspect in the Amtorg bombing because of conversations overheard on an unlawful wiretap installed at J.D. L. headquarters early in 1971. This knowledge, gleaned through wiretaps, enabled the government immediately to identify Seigel as the purchaser of a quantity of wire and batteries at a Brooklyn store called the Radio Shack on June 3, 1971. Thus Seigel was placed under surveillance on June 4, 1971 and ultimately arrested at the Meyers Brothers garage on that same day. At the garage Seigel's car was subjected to an illegal search, the fruits of which have already been described. This arrest, in turn, placed Seigel at the mercies of various government officials who further violated his constitutional rights by eliciting information from him in the absence of counsel, and who, indeed, actively discouraged Seigel from disclosing any of his meetings with these officials to his lawyer. In addition, the information was allegedly obtained from Seigel on the express understanding that he would never be re-

quired to testify, either in the Amtorg or Hurok cases. Thus Seigel argues that each link in the chain that led to his disclosures contains its own illegalities and is also tainted by the original illegality of the wiretap. I therefore propose to examine each "link" in turn.

Although Seigel contended that each "link" could, in itself constitute sufficient grounds to justify his refusal to testify, the links were also presented together as a continuous chain of wiretap taint. We conclude, therefore, that the district judge did not exceed his authority by considering the ancillary constitutional claims in the context of a wiretap taint hearing.[6] Accordingly, we reach the merits.

## IV.

After reviewing the evidence, the district judge concluded that (a), Seigel's identity and participation in the Amtorg bombing were disclosed by an independent source and not by the illegal wiretap on JDL offices, and that Seigel's involvement in the Hurok bombing was disclosed by his statement to Parola and Gibney on May 7, 1972, and not by illegal wiretaps placed on Seigel's home telephone between December 15, 1971 and March 1, 1972; (b), the search of Seigel's automobile on June 4, 1971, which disclosed evidence linking Seigel to the Amtorg bombing was a volation of the Fourth Amendment;[7] (c), no unqualified promise was made to Seigel that he would not be required to testify

6. Of course, the argument that permitting witnesses to raise constitutional claims will disrupt the orderly flow of court proceedings is inapplicable here since the trial would have been delayed in any event by the electronic surveillance taint hearing. The additional delay here involved was minimal. Arguably, *Gelbard* compels the district court to include consideration of alleged constitutional violations if they are ancillary to the wiretap claims. Otherwise, an aggrieved party might be foreclosed from effectively raising his claim of wiretap taint. We do not decide that question.

7. The government does not contest this ruling and we see nothing in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706, decided by the Supreme Court on June 22, 1973, to undermine it. We note here that the district judge prohibited the government from questioning Seigel on the basis of evidence seized unlawfully during the June 4, 1971, search. The court did not, however, indicate what line of questioning would be foreclosed by its ruling.

in the Hurok case since he received only a conditional assurance that the case would be "built around him" if possible; (d), no statements were deliberately elicited by surreptitious means from Seigel in the absence of counsel and, therefore, no violation of the right to counsel had been shown under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Accordingly, the judge concluded that in the absence of any taint, Seigel lacked just cause to refuse to answer the government's questions at trial.

We conclude, however, that under the extraordinary circumstances that prevailed in this case, the government failed to sustain its burden of proving that information in its possession which formed the basis of its questioning of Seigel at the Hurok trial was untainted by unlawful electronic surveillance.

Our principal focus is the government wiretap on the offices of the Jewish Defense League in Brooklyn, maintained from October 1970 to July 2, 1971, a period that spans the Amtorg bombing, Seigel's arrest, on June 4, 1971, and the search of his car on the same day. In view of Detective Parola's testimony with respect to the use he made of the fruits of that search, and to which we have already referred in part III of this opinion, and Judge Bauman's conclusion that the search was unlawful, the source of Parola's knowledge of Seigel's identity becomes a question of substantial importance. In Gelbard v. United States, *supra*, in tracing the legislative history of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 [hereinafter "the wiretap statute"] the Court noted that the protection of the statute extended even to the discovery of the identity of an individual through illegal electronic surveillance:

> Congressional concern with the protection of the privacy of communications is evident . . . in the specification of what is to be protected. "The proposed legislation is intended to protect the privacy of the communica-

tion itself . . . ." S.Rep.No. 1097, 90th Cong., 2d Sess., 90 (1968). As defined in Title III, " 'contents,' when used with respect to any wire or oral communication, includes any information concerning the *identity* of the parties to such communication or the existence, substance, purport or meaning of that communication." 18 U.S.C. § 2510(8). The definition thus "include[s] all aspects of the communication itself. *No aspect, including the identity of the parties . . .* is excluded. The privacy of the communication to be protected is intended to be comprehensive." S.Rep.No.1097, *supra*, at 91.

408 U.S. at 41, n.10, 92 S.Ct. at 2362 (emphasis added).

Moreover, years prior to enactment of the statute, this Circuit adopted the view that the government may not rely on the testimony of a witness that is based on the discovery of that witness's identity in the course of unlawful electronic surveillance, United States v. Tane, 329 F.2d 848 (2 Cir. 1964). Of course, the question is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *Tane* is consistent with that test, as noted in decisions of this Court in United States v. Cole, 463 F.2d 163, 171–172 (2 Cir. 1972), and United States v. Friedland, 441 F.2d 855, 860 (2 Cir.) cert. denied 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971). While these cases quite correctly assert that disclosure of an individual's identity in connection with one criminal act does not, by itself, preclude the government from ever using evidence of an unrelated crime in which he is involved, the rule survives that the government must show that evidence to

which objection is made derives from an independent, untainted source and investigation. We can see no escape from the principle that a party raising objections to questions based on illegal electronic surveillance must be given a meaningful opportunity to argue that the evidence has been obtained by exploitation of the primary illegality.

This, of course, is nothing more than a restatement of principles so clearly enunciated in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L. Ed.2d 176 (1969). *Alderman* established a procedure for conducting wiretap taint hearings. It asserted that:

> When an illegal search has come to light, [the government] has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners . . . must go forward with specific evidence demonstrating taint. "[T]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of a poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof has an independent origin. Nardone v. United States, 308 U.S. 338, 341, [60 S.Ct. 266, 84 L.Ed. 307] (1939)."

Alderman v. United States, *supra*, at 183, 89 S.Ct. at 972.

In the case before us, the government turned over summary logs of illegal electronic surveillance on the offices of the Jewish Defense League—maintained from October, 1970, to July 2, 1971—and on the home telephone of Sheldon Seigel —maintained from December 15, 1971 to March 1, 1972—and asserted that to the best of its knowledge, after full exploration, these were the only known wiretaps over which conversations of Sheldon Seigel had been overheard. The logs were prepared by FBI "monitors" whose function was to listen to the actual conversations, record them on tape and, from notes made during the conversa-

tion, prepare a summary. Six of Seigel's conversations were overhead on the JDL wiretap and numerous conversations of Seigel's were overheard on Seigel's home wiretap.

The actual tapes of these conversations could not be turned over to Seigel because, the government conceded, they had been destroyed. Nor were any transcripts of the actual conversations made. This concession is most troublesome for on another occasion a representation was made to a United States district judge that the policy of the FBI since 1968 has been to preserve electronic surveillance tapes, *see* United States v. Ivanov, 342 F.Supp. 928, 941 and n.12 (D.N.J. 1972), on remand from the Supreme Court, 394 U.S. 939, 89 S.Ct. 1177 (1969). Indeed, Section 2518(8)(a), of the 1968 wiretap statute, the so-called warehousing provision, specifically provides that the contents of wire or oral communications intercepted under the authority of the statute shall, if possible, be recorded on tape and shall not be destroyed, except by order of the court, "and in any event shall be kept for ten years." The government could not ask for a clearer legislative intention and direction.

The significance of the destruction of this evidence cannot be understated in this case. To compel a party who objects to the use of evidence obtained as a result of unlawful wiretapping to go forward with a showing of taint, Alderman v. United States, *supra*, 394 U.S. at 183, 89 S.Ct. 961, and then to withhold from him the means or tools to meet that burden, is to create an absurdity in the law. The problem is particularly acute in this situation where no apparent reason for the destruction of tapes suggests itself, nor has one been suggested by the government. We recall in this connection that Congress specifically provided that under no circumstances may electronic surveillance tapes—even those obtained legally—be destroyed for a period of at least ten years. Individual rights, particularly the right of privacy so para-

mount in the minds of the drafters of the wiretap statute, cannot cavalierly be balanced away by other factors whether they be concern for efficient warehouse space management or different undisclosed reasons.

The government urges us to adopt the principle that considerations which bear on judicially authorized wiretaps are not applicable to the wiretaps presently under discussion, because so-called warrantless domestic security bugging not expressly held unlawful at the time these taps were installed, was not found to be invalid until the Supreme Court decided the question in United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). We are urged to hold, therefore, that the warehousing provision, 18 U.S.C. § 2518(8)(a), which requires preservation of records only for electronic surveillance authorized by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, does not apply to the wiretaps here under review. Since we do not today announce a *per se* rule that the government's failure to preserve the wiretap tapes must result in a reversal of these contempt orders, we need not decide the question. We note, however, that it would be a startling, if not preposterous, ruling that permits a more relaxed standard for illegal than for legal wiretaps. Such a precept would serve only to encourage illegal wiretapping. Moreover, since the warehousing provision of the statute, particularly in the light of *Alderman*, makes eminent good sense and serves the interests of fair play, in the context of this case the failure to produce the actual tapes, or accurate and complete transcripts of the overheard conversations so that Seigel could carry his burden at the taint hearing, compels us to strictly scrutinize the government's claim of independent source.

That claim with respect to the JDL wiretap was presented by the testimony of two government witnesses, Detective Santo Parola and Detective John McKeegan. The district judge clearly understood the significance of the taint question with respect to the first wiretap, since he permitted the government to reopen the hearings, over Seigel's objection, for the purpose of calling McKeegan to testify for the first time and, in addition, to have Parola return to the stand to clarify the nature of the police investigation which first brought Seigel to the attention of government officials. The government's version, accepted by the district judge, was that police agents had recovered an unexploded bomb from the Amtorg case and upon its dismantling, discovered that the bomb made use of a Micronta timing device. Further, investigations revealed that timers were purchased by a man named Feldman at Radio Shack, Inc., in the Borough Park section of Brooklyn, one day prior to the Amtorg bombing. On June 3, 1971, Detective Parola of the New York City Arson and Explosion squad received a telephone call from the manager of the Radio Shack store who stated that Feldman had just purchased a substantial quantity of wire and a box of twenty-four batteries. The proprietor gave Parola the license number of the car, described as a gold Volvo, driven by the purchaser. A check of registration records indicated that the car belonged to one Irwin Seigel—a brother of the witness Sheldon Seigel.

Detective John McKeegan, who had been assigned to the Arson and Explosion squad in April, 1971, testified that he was present when Parola received the telephone call. He told Parola that the gold Volvo actually belonged to Sheldon Seigel. McKeegan, according to his testimony, had learned this information while assigned to the 19th Detective Squad during his own investigation of a fire bombing of the Iraqi Mission to the United Nations, which occurred on March 2, 1971. At that time, McKeegan interviewed a doorman in the building across the street from the mission who, when shown photographs at the Department's Bureau of Special Investigation, chose two as resembling the participants in

the bombing, one photograph being that of Sheldon Seigel. McKeegan continued his investigation, visited Seigel's home in Brooklyn and noticed that Seigel drove a gold Volvo. For reasons unexplained in the record, no arrests were ever made in that case.

McKeegan further testified that he provided Parola with a photograph of Sheldon Seigel, which Parola showed to the proprietor of the Radio Shack store. He identified Seigel as the "Feldman" who had purchased the Micronta timers and the wire and batteries. Surveillance was commenced on Seigel which led to his arrest the following day.

Parola, who corroborated McKeegan's testimony, also noted that he never received information from wiretap sources concerning Seigel. Thus, although the extraordinary good fortune of the New York City Police Department in this investigation must be considered nothing less than miraculous, the government's proof of independent source was, at least on its face, a strong one.

The government, however, was not the only party to engage in bugging in this case. Sheldon Seigel, by all accounts both devious and resourceful, tape recorded several conversations between himself and Detective Parola, one of which, occurring sometime in the fall of 1971, is particularly significant and revealing. The conversation, by its reference to the Amtorg investigation, reveals a different version of the manner in which the police learned of Sheldon Seigel's identity:

Seigel: Yeah, but on the first case if they wanted to drop it, they woulda dropped it already, they're just waiting around til after the second case is over, they just wanna, just wanna keep

Parola: They can't Shelly, it's horseshit, Shel.

Seigel: I know it's horseshit but

Parola: You know that

Seigel: I know, and they just want to keep me (inaudible)

Parola: All right. If we wanted to prosecute the first case, don't you think we got a good chance of knockin' you over if we really push.

Seigel: Not much.

Parola: Supposing I decide to testify, and I bring Joe [Gibney] up to testify. You know about the shit that was bought in the store and how we came to get all this information. *You know it's done on wiretaps.*

Seigel: What's that have to do with the first case.

Parola: *'Cause that's how we stumbled on to you. What do you think fingered ya?* We did. We checked that store out again, and we found out you bought those batteries, and we said that you're up to no fuckin' good. We said we better watch this kid cause their up to no fuckin' good, and we never had your name before. Said this is a fuckin oddball name. We never had this kid before. That's how we stumbled on to ya. You know that. If you don't know that you're stupid or your fuckin' lawyer's dumb. Supposing me and Joey now turn around and say O.K. we told Mel Glass, listen, we're going to testify for you Mel, I'll tell you exact—[emphasis added]·

Judge Bauman, referring to this passage in a footnote, discussed the government's claim that the critical phrase, emphasized above, should read: "You know it's *not* on wiretaps." In a rather puzzling explanation the district judge stated that there was "considerable uncertainty" as to what actually was said, that he listened to the tape several times and "reached the conclusion that the critical word was done," (instead of "not"), but that the context supports a reading of "not". This Court, however, which is in as good a position as the district judge to determine what the precise language was, listened to the tape many times over. We have concluded, without the slightest doubt, ambiguity or uncertainty, that Parola related to

Seigel: "You know it's *done* on wiretaps."

Parola's words, therefore, must inevitably raise questions about the invincibility of the government's proof of independent source. If the New York City police department did learn of Seigel's involvement from a wiretap lead, the contents of those wiretaps, in the hands of Seigel's counsel at the taint hearing, may have dealt a shattering blow to the government's proof of independent source. For if wiretaps were indeed involved, Parola's in-court testimony on independent source, undermined on this critical point, would clearly have counted for little thereafter.

Of course, at this juncture we may only speculate whether the actual tapes would have revealed matters of importance which did not appear in the summary logs. But we cannot rely solely on the government's "good faith" representation on such a critically contested issue. Indeed, the government's good faith did not prevent illegal wiretapping here, nor did the government's good faith prevent it from searching illegally, or from narrating an account of the circumstances of that search which the court found to be incredible. In the face of Parola's own admission, speculation at this point only weighs against the government's plea that its claim be taken at face value. This "trust us to do the right thing" argument was roundly rejected by the Supreme Court in United States v. United District Court, *supra*. Moreover, we said in United States v. Smilow, that "[i]f government agencies are going to employ such surveillance techniques, responsibility for accurate description to the courts of the results of these efforts rests with those who make the report." 472 F.2d 1193, 1973. We are unable to conclude, therefore, that Seigel was not prejudiced by the destruction of the tapes. We believe, to the contrary, that destruction of that evidence effectively foreclosed him from fully pursuing the issue of taint.

■ The teaching of the Supreme Court in Alderman v. United States, *supra,* cannot be avoided. We are instructed that when illegal electronic surveillance has come to light it is the adversary system, not representations by the government and not *in camera* decisions by the court, which must be relied upon to determine whether overheard matter is "relevant" to the taint hearing.[8] Here, the logs represent only a monitor's summary of the intercepted conversation. In a case such as this, however, with doubt cast upon the government's proof by their main witness's own admission of knowledge of the wiretap,[9] we cannot ignore the significance

8. "Adversary proceedings are a major aspect of our system of criminal justice. Their superiority as a means for attaining justice in a given case is nowhere more evident than in those cases, such as the ones at bar, where an issue must be decided on the basis of a large volume of factual materials, and after consideration of the many and subtle interrelationships which may exist among the facts reflected by those records. As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of *ex parte* procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable." Alderman v. United States, 394 U.S. 165, 183–184, 89 S.Ct. 961, 972 (1969)

9. While there is some evidence in the record indicating that the government agent in charge of the Seigel home wiretap, John Doggett, did not listen to the actual tapes but received only the logs from the F.B.I. "monitors," there is no evidence in that regard as to the wiretap of the JDL office telephone. The record is even silent as to the name of the government agent who supervised that wiretap. The government did not call any of the monitors to testify, although it represented at oral argument that the tapes were heard only by the monitors. We cannot accept these representations in lieu of evidence. Moreover, even had the monitors been called, or had the supervising agents testified, Seigel's ability to cross-examine would have been severely limited because of the unavailability of the actual tapes or, at least, a transcript of the intercepted

to the adversary character of the taint hearing of the destroyed records. The Supreme Court articulated the reason eloquently:

> An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

Alderman v. United States, *supra,* at 182, 89 S.Ct. at 971. We conclude, therefore, that under the *sui generis* circumstances of Seigel's case, destruction of the tapes or at least the failure to provide an accurate transcript of overheard conversations, denied to him the necessary armaments with which to pursue the adversary encounter contemplated by *Alderman.* Since the tapes are no longer in existence, remand for further proceedings would be futile. Accordingly, the order of civil contempt against Seigel is reversed and vacated.

### V.

■ The appeals of Richard Huss and Jeffrey Smilow do not raise questions of comparable difficulty. Huss, who was called to testify on June 8, 1973, and granted immunity, refused to answer questions on the ground that Jewish law, which he observes, forbids him to testify against a fellow Jew in a non-Jewish court under the circumstances of this case. Judge Bauman rejected this claim on the basis of this Court's opinion in Smilow v. United States, 465 F.2d 802 (2 Cir. 1972), vacated and remanded on other grounds 409 U.S. 944, 93 S.Ct. 268, 34 L.Ed.2d 215 (1972), 472 F.2d 1193 (2 Cir. 1973).

Although there are distinctions between the instant claims and those presented in the earlier case, they are distinctions without a difference to an American court. Accordingly, the order of civil contempt against Richard Huss is affirmed.

■ Jeffrey Smilow was held in civil contempt on June 8, 1973. He too argues that his refusal to answer questions was justified on the basis of Jewish law. That claim is rejected on the authority of United States v. Smilow, *supra.* Smilow also argues that by his testimony he is twice placed in jeopardy for the same crime. Since this appellant was not a defendant in the proceedings below, we utterly fail to comprehend his point. Moreover, he was granted immunity from prosecution based on his testimony thus eliminating any possible claim of self-incrimination. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

■ Finally, he argues that his refusal to testify was justified because illegal electronic surveillance of JDL offices disclosed conversations involving a person named "Jeff" and that destruction of the tapes compels a reversal of the order of contempt against him. The background facts are relevant here. In the first *Smilow* case, cited above, Smilow was held in contempt for refusing to answer questions before the grand jury investigating the Hurok and Columbia Artists bombings. The judgment was affirmed by this Court. In the Supreme Court, for the first time, the Solicitor General admitted the possibility of illegal surveillance when wiretap logs revealed conversations of an individual known only as "Jeff". The judgment was vacated and remanded, and this Court remanded to the district court for further proceedings. There the order of contempt was subsequently dismissed on the government's motion. In the instant case, when Smilow was called to testify,

---

conversations. Under the circumstances of this case, by which we mean Parola's own admission that he had knowledge of

wiretapping, such limits would have been improper.

the logs that might have some possible relationship to his conversations were turned over to him. They show six facially innocuous telephone calls, all on May 18, 1971. At that point, counsel requested the actual tapes and, upon being informed that they had been destroyed, stated: "Your honor, on this basis alone I would ask your honor to direct the Government to refrain from calling Mr. Smilow as a witness." On the ground asserted, the Court properly denied the motion. At no time did Smilow's counsel request a hearing, nor did he suggest that the government's questioning of Smilow had been tainted by illegal electronic surveillance. In fact, counsel's principal concern was the disclosure of tapes recorded by Seigel (not the government), of private conversations with Smilow, which counsel understood would form the basis of questions to be asked Smilow at trial. It was abundantly clear to counsel that Seigel, not the wiretap, was the source of the government's information concerning Smilow. Since Smilow never moved to suppress, nor even remotely suggested to the court that a proper claim of taint was before it, we conclude that Smilow lacked just cause in refusing to answer questions at trial. Accordingly, the order of civil contempt against him is affirmed.

## VI.

In view of our disposition of the knotty problems presented to us, some final comments are required. It should be clear by now that the problem of electronic surveillance strikes deep emotional chords in a people whose concern for the protection of privacy—particularly the privacy of words and thoughts—is historic. In Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Congress responded to this by balancing the needs of law enforcement against the important public and individual concern for privacy. It authorized electronic surveillance only under the most rigorous, carefully drawn standards. A cavalier, carefree and careless attitude towards the conduct of electronic surveillance makes a mockery of the labors of Congress to tailor the statute with precision. More importantly, it offends the spirit of liberty which has distinguished this nation from its birth.

The rule we announce today would not have been necessary had law enforcement officials simply preserved records of the surveillance tapes as the statute requires. The law imposes, in this respect, only the most minor inconvenience upon the government but which, at the same time, serves as an invaluable guarantee of individual rights. Adherence to that rule, even were it not mandated by law, would serve the government's interest for it would build confidence in its integrity and good faith. We often speak of governmental interests as opposed to individual rights. We should realize, however, that it is the government's principal duty to safeguard individual liberties if it is to continue to serve the people well.

Of course, we all suffer when, in Cardozo's classic phrase, the criminal goes free because the constable has blundered. People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585 (1926). The remedy however is to help the constable not to blunder. The problem of crime, particularly the diabolical crimes charged in the indictment here, is of great concern to us. But if we reflect carefully, it becomes abundantly clear that we can never acquiesce in a principle that condones lawlessness by law enforcers in the name of a just end. There are those who argue that on occasion illegal methods must be employed to preserve the rule of law. Justice Brandeis responded eloquently to that argument and his words need no embellishment:

In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites

every man to become a law unto himself; it invites anarchy. To declare that in the administration of criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Olmstead v. United States, 277 U.S. 438, 471, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (dissenting opinion).[10]

The orders of civil contempt against Smilow and Huss are affirmed. The order of civil contempt against Seigel is reversed and vacated.

---

10. We could not conclude without observing that the proceedings before Judge Bauman were conducted by him with superior craftsmanship and even-handedness. A capable trial judge, alert, responsible and intelligent government attorneys, and imaginative and able counsel for the appellant Seigel, explored complex factual and legal issues competitively, yet courteously, and always in the pursuit of truth. Recently, we have had occasion to comment in several cases on shoddy proceedings below. It is appropriate, therefore, to commend those who have exhibited an awareness of the virtues of adversary proceedings conducted in the respected tradition of our profession.