**UNITED STATES of America,**
**Appellee,**

v.

**Stuart COHEN, Appellant.**
**No. 341, Docket 73-2121.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1973.

Decided Dec. 17, 1973.

---

See also D.C., 358 F.Supp. 112.

nous, irrelevant and highly prejudicial evidence" in connection with its proof on the conspiracy count; that a question asked by the Government of defendant on cross-examination was so prejudicial as to require a new trial even though it was objected to, not answered, and the jury was instructed to disregard it; that appellant should have been given a hearing on his allegation that the present indictment was in contravention of a plea bargain made in the Eastern District; and that appellant's motion for a hearing on the issue of electronic surveillance was timely made. We believe that none of these points has merit and accordingly affirm the conviction.

Appellant, 17 years old at the time of the offenses with which he was charged, was an active, participating and sometime ranking member of the Jewish Defense League (JDL) in connection with some of its activities, particularly its summer firearm instruction and training at Camp Jedel, which was located in Sullivan and Ulster Counties near Woodbourne, New York. Appellant, with co-defendant David Sommer, was charged in a superseding indictment which, after election by the Government to waive seven of the original 13 counts at trial, consisted of six charges. Count One charged a conspiracy (18 U.S.C. § 371) allegedly begun in May, 1970, and ended on September 30, 1971, to defraud the United States and to violate the federal firearms statutes (18 U.S.C. §§ 922(a)(6), 924(a)), and the catch-all false forms statute (18 U.S.C. § 1001). Counts Three and Four charged the making of false statements on July 29, 1970, with respect to information required to be kept in the records of persons licensed to sell firearms, *viz.*, that two .308 calibre Remington rifles, Model 788, high-powered rifles with scopes attached, were respectively being transferred to a Manfred Begin of Ozone Park, New York, and a Tzvi Ben Ami of Brooklyn, when in fact the names and addresses of the transferees were fictitious. Counts 11, 12 and 13 charged, in connection with the same two firearms and a third

---

Bertram Zweibon, New York City, for appellant.

Joseph Jaffe, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., Michael Q. Carey and S. Andrew Schaffer, Asst. U. S. Attys., on the brief), for appellee.

Before SMITH, FEINBERG and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellant was convicted below of conspiracy, of making false written statements in connection with the acquisition of firearms, and of falsifying federal forms; he seeks a new trial—not on the basis of insufficiency of the evidence—but on four grounds: that he was deprived of a fair trial by virtue of the Government's introduction of "volumi-

Remington Model 788, the submission of false information in federal forms under 18 U.S.C. §§ 1001–1002, in that the names, addresses and New York State Department of Motor Vehicles identification numbers of the three supposed transferees were false.

The Government proofs included the testimony of the owners of Dau-Son's Hardware and Sporting Goods Store in Woodbourne, New York, which sold the firearms, and of two undercover New York City police officers who had infiltrated the JDL organization and particularly its "Oz A" squad, certain stipulations, and corroboration by tape recordings made by the police officers. The Government evidence was to the effect that the weapons were bought for JDL and its Oz A squad with appellant and former codefendant David Sommer[1] negotiating the purchase by means of fictitious purchasers with fictitious addresses and motor vehicle license numbers. Specifically as to appellant, the Government proved that he obtained the federal firearms transaction records form 4473, ordered the weapons, delivered the falsely filled out form and the Camp Jedel check which paid for the weapons to Dau-Son's and picked up the weapons from it, all with knowledge that the forms were falsely completed. Appellant was sentenced as a youthful offender to concurrent terms of imprisonment of five months on each count on which he was convicted. As will be seen, it is not without significance that appellant's attorney on appeal was ex-counsel at trial and was also counsel to Sheldon Davis and cocounsel with Barry I. Slotnick, Esq., who was counsel to appellant herein, in respect to the Southern District indictment—since dismissed —for the firebombing resulting in the death of a secretary at the office of Sol Hurok.

As previously stated, appellant does not claim that his conviction was based upon insufficient evidence. Rather he argues that his trial was unfair because the Government's case proved too much, that is to say, there was evidence introduced by the Government as to the JDL and assorted members in it, as to Camp Jedel, and other background and hearsay evidence not directly involving the defendant which was irrelevant to the offenses charged and unfairly adduced. Appellant rightly points out that no guilt by association or probative value can be inferred from the fact that he was a member of the JDL. United States v. Fantuzzi, 463 F.2d 683, 690 (2d Cir. 1972). See United States v. Kompinski, 373 F.2d 429, 434 (2d Cir. 1967).

The gist of appellant's complaint was that a considerable amount of the Government's proof had no bearing on the specific substantive charges made and at best only indirect bearing on the conspiracy charge because the conspiracy charge related to the filing of specific false federal firearms applications or the filling out of specific false federal forms. This evidence was in three basic forms. First, there was evidence that directly tied appellant to active participation in the JDL by linking him to meetings at JDL headquarters at various locations in the city of New York and the activities of the summer training camp, Camp Jedel, by proof of his active participation there with guns and firearms, together with a number of statements or admissions on his part dealing with firearms in an illegal context, e.g., that appellant would have liked to have sawed off to shorter than legal length the Belgian shotgun which he kept under his mattress, that a coconspirator (Joffe) had gone to Israel to acquire Uzi submachine guns, that he (appellant) had tried to buy gunpowder at Dau-Son's hardware store, that he was ordering "a hell of a lot of stuff," that he asked one of the undercover police officers to pick up some 8-inch pipes with caps for an incident scheduled to

---

1. Appellant's codefendant, Sommer, entered a plea of guilty to Counts 11, 12 and 13 on the morning of the trial.

take place, and the like. Second, there was evidence that the JDL was involved in the acquisition of arms and ammunition of various kinds, this consisting both of weapons observed by the police officers at Camp Jedel and evidence as to various JDL members keeping and procuring arms, ammunition or other materiel, as well as declarations made by other JDL members both in and out of the presence of appellant relative to the procuring and use of firearms, e. g., the importation of machine guns from Israel in falsely marked crates, the illegal purchase of small arms, and the JDL firearms training program. Third, the Government produced evidence that the JDL was involved in a program of training for violent action—this included evidence from the mouth of appellant himself about the slogan "For Every Jew, a .22," about the JDL's possession of riot shotguns (some of which were used for instructional purposes at Camp Jedel), the teaching of the manufacture and use of Molotov cocktails, a discussion as to the use of silencers in connection with assassinations, another concerning the alteration of the Uzi submachine gun so as not to be able to trace the weapon through shell casings or bullets found at the scene, still another as to the acquisition of handguns from a "Mafia contact" (as to which the court on its own motion instructed the jury to disregard the term), and the like.

■ While much of this evidence, particularly in the third category, did range rather far afield from the specific crimes for which appellant was being tried, all of it related to the purpose, scope and existence of a conspiracy on the part of the JDL and its leaders to acquire weapons and ammunition through illegal means, of which the very conspiracy charged specifically in Count One was a part. Much of the evidence was invited by defense counsel's laying down the gauntlet in opening: "where did they conspire, how did they conspire, what was said, who was the initiator, who was the leader, what were the facts . . . were there discussions, were there conversations . . . ." Transcript, vol. 3, at 20–21. Much of the evidence was admitted indeed without objection,[2] but we do not uphold the conviction on this ground. Nor need we go so far as to say that the evidence was admissible as "background" evidence in a complicated conspiracy as in, e. g., United States v. Colasurdo, 453 F.2d 585, 591 (2d Cir. 1971). Specifically we hold that evidence of observations made by the infiltrating police officers and of acts relating to the acquisition of weapons by other members of the conspiracy charged in the indictment were admissible to prove the existence and aim of the conspiracy charged. See United States v. Costello, 352 F.2d 848, 854 (2d Cir. 1965), rev'd on other grounds sub nom. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The statements and acts of the appellant admitted were admissible to show his state of mind, his intent, in respect to the conspiracy. Cf. United States v. Del Purgatorio, 411 F.2d 84, 86–87 (2d Cir. 1969).

2. Examples include appellant's claim in his brief at Page 61 that the Government openly displayed two dozen rifles; in fact these rifles were a defense exhibit, DX–H, produced in court over Government objection at defense request. Moreover, both at opening and during the trial appellant indicated that he would bring out his involvement with guns, bombs, rifles, bombings, Molotov cocktails, hijackings and such. His involvement with bombs was first brought out, for example, on the cross-examination of the Government's witness, Dau-Son's Hardware Store owner David Brown. Information was elicited on cross-examination from Police Officer Rosenthal about killings, assassinations, bombings, racial havoc, etc. Indeed, one wonders precisely what the defense strategy was in the case. A clue may lie perhaps in counsel's statement in opening, "And Mr. Cohen does believe, as I believe and as many other Jews believe, that another holocaust may come and that we may have . . . reason to defend ourselves." Transcript, vol. 2, at 18.

■ Extrajudicial declarations of coconspirators were admissible against the appellant once the trial judge had concluded by a fair preponderance from proof other than such declarations that the appellant was shown to be a member of the conspiracy. United States v. Manfredi, 488 F.2d 588 at 596 (2d Cir. 1973); United States v. Puco, 476 F.2d 1099, 1107 (2d Cir. 1973); United States v. Projansky, 465 F.2d 123, 137–138 (2d Cir.), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied, 397 U.S. 1028, 90 S.Ct. 1276, 25 L. Ed.2d 539 (1970). Some of these declarations were admitted subject to connection as is usually the case and, absent any motion to strike or requested instruction, appellant cannot be heard to complain of this now. In his opening statement, moreover, counsel for appellant raised the issue of entrapment by telling the jury that Rosenthal, the chief infiltrating police officer, "egged on the defendant . . . entrapped the defendant . . . encouraged the defendant to commit the acts which he certainly knew were wrong, criminal, morally reprehensible." Transcript, vol. 3, at 25. Thus the Government was entitled to anticipate the defense and to prove appellant's predisposition to commit the acts charged and his propensity to engage in the unlawful acquisition of firearms by making false statements. Cf. United States v. Russell, 411 U.S. 423, 433–436, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); United States v. Rosner, 485 F.2d 1213 at 1221–1222 (2d Cir. 1973). Similarly, since appellant had in his opening statement put into issue his motive and intent to commit the crimes charged,[3] evidence of prior similar acts and involvement on appellant's part in allegedly illegal JDL activities was admissible on this issue. United States v. Brettholz, 485 F.2d 483, at 487 (2d Cir. 1973).

Appellant contends that the court failed properly to instruct the jury with regard to evidence received subject to connection and the purpose for which the evidence was introduced but appellant failed to make any requests, even though specifically asked by the court, for charges along the lines he now claims should have been given, even though reminded to do so at the time the court ruled on requests to charge. Appellant also failed to except to the charge or supplemental charge. Under Fed.R.Crim.P. 30 and United States v. Tourine, 428 F.2d 865, 868–869 (2d Cir. 1970), cert. denied, 400 U.S. 1020, 91 S. Ct. 581, 27 L.Ed.2d 631 (1971), appellant's complaint on this score comes too late.

■ The second main point urged by appellant is that the Government committed reversible error in asking appellant on cross-examination "Is Sol Hurok an anti-Semite?" Appellant's claim is, of course, that the sole purpose of this question was to advise the jury that there was a connection between Cohen and the January 26, 1972, firebombing of Hurok's office which resulted in the death of a secretary.[4] Appellant had previously stated that the JDL's main purpose was to combat anti-Semitism and, on cross-examination before the question relating to Sol Hurok, he was asked if it were correct that the aim of the JDL was to protect people from anti-Semitism. The court sustained objection to the Sol Hurok question and immediately informed the jury that "It makes no difference whether [Sol Hurok] is [an anti-Semite]." Transcript

---

3. We will not deny that Mr. Stuart Cohen knew that guns were purchased. What we deny is that he at any time knowingly, willfully, and unlawfully did anything that he knew and felt and thought and understood to be wrong and criminal at the time that he was doing it. Transcript, vol. 2, at 17–18.

4. Appellant was one of three codefendants in United States v. Cohen, Davis and Segal, S–72 Cr. 778, the trial of which was begun on May 30, 1973; the case was apparently dismissed after three of the Government's witnesses refused to testify.

at 1417. Shortly thereafter in the jury's absence the Government made what amounted to an offer of proof in pointing out that its witness, Officer Eisner, was available on rebuttal to testify as to appellant's previous anti-Hurok agitation (transcript at 1426–27); this offer of proof was totally unrelated to the pending bombing charge, and referred to various sit-in demonstrations and disturbances participated in by appellant and directed against Sol Hurok. The court refused to permit the Government to question Eisner on that subject. The only other allusions to Hurok during the trial were made by defense counsel, either in making an objection [5] or in summation.[6]

In the overall context of this ten-day trial involving approximately 1,700 pages of transcript, we do not think that the asking of this one question was in and of itself prejudicial error, particularly in the light of the court's firm action sustaining the objection and pointing out the immateriality of it, at least where the question itself contained no reference to the Hurok bombing and there was a good faith offer of proof relative to appellant's engaging in other anti-Hurok activities and demonstrations. In so holding we need not accept the Government's argument that appellant invited reference to this by his statements on direct examination that he had been indicted on charges in the Southern District to which he had pleaded not guilty or that he had been interviewed by the Federal Bureau of Investigation. Nor do we accept the argument that by virtue of counsel's own references either in connection with objections or in summation that any possible prejudice was cured, since these references may have been directed to avoiding any prejudice to the appellant from the Government's question. Parenthetically, the comments of defense counsel in making the "Sheldon Davis" objection seem to us to be part of an overall strategy which we choose not to examine in depth. *See* note 2 *supra.*

Appellant's argument that he had been promised by the United States Attorney's office in the Eastern District of New York that he would not be prosecuted on the facts alleged under the present indictment borders on the frivolous. It was not until the morning of trial that appellant, for the first time and without supporting papers, moved to dismiss the instant indictment on the ground that the prosecution constituted double jeopardy. He claimed that this indictment was based on the same facts as certain indictments filed in the Eastern District of New York. The motion was denied with leave to renew, and it was renewed subsequent to trial. In a post-trial motion appellant's attorney stated in his affidavit that, had the defendants named in one of the two Eastern District indictments gone to trial (appellant was not included as one), three of the weapons at issue in the instant indictment (which were not mentioned in the Eastern District indictment) would have been introduced into evidence. Uncontradicted affidavits of the United States Attorney for the Eastern District and his two chief assistants indicated, and the trial court found, that there was no factual basis to show that any promise had been made to appellant or that he had relied on one, that the facts underlying the indictments in the Eastern District were wholly separate and apart from the facts concerned in the present indictment, that there was no promise of immunity made to appel-

5. Your Honor, may I object to this? What is the purpose of pointing out Sheldon Davis, who is under indictment for bombing in Hurok? What is the point of this, and why is it permitted, your honor?
Transcript at 1625.

6. You heard Mr. Jaffe get up in front of you, in front of the jury, and ask Stuart Cohen if Sol Hurok was an anti-semite
. . . .
Let me remind you, if I may, that Stu Cohen is not on trial here for making a bomb, for bombing Hurok . . . .
Transcript at 1746.

lant, and that at the time of the pleas in Brooklyn the crimes alleged in the instant indictment were not under investigation. The district court properly relied on the transcript, affidavit and exhibits and was not required to hold an evidentiary hearing. *Cf.* United States v. Carlino, 400 F.2d 56, 58 (2d Cir. 1968), cert. denied, 394 U.S. 1013, 89 S. Ct. 1630, 23 L.Ed.2d 39 (1969); Accardi v. United States, 379 F.2d 312, 313 (2d Cir. 1967). While on appeal for the first time appellant claims that there was an agreement by the United States Attorney for the Eastern District to the effect that the Government "would not introduce any evidence to be introduced on the Eastern District indictment in any subsequent criminal prosecution of appellant," this argument finds no support whatsoever in the record by way of an affidavit from appellant or otherwise.

 Appellant's fourth and final point is that he was entitled to a hearing on the issue of electronic surveillance. He claims in his brief that the Government's evidence was obtained by an illegal wiretap with the issue of taint being impossible to explore by virtue of the fact that the tapes themselves were destroyed, and he refers us specifically to United States v. Huss, 482 F.2d 38, 52 (2d Cir. 1973), which he claims involved tapes from the very taps in the instant proceeding. He argues that it was the understanding of his counsel that the trial of the instant proceeding would follow the trial of the Hurok bombing case; United States v. Cohen, Davis and Segal, *supra,* and therefore he refrained from making any wiretap motion pending a determination in the prior litigation as to the legality of the taps and the effect of the destruction of the tapes. However, 18 U.S.C. § 2518(10)(a) clearly states that a motion

such as appellant's "shall be made before the trial. . . ." and here it was not made until after the trial and four days before sentence. It would appear clear that appellant waived his rights. United States v. Grant, 462 F.2d 28, 32 (2d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972). His counsel was well aware of the issue raised in *Huss, supra,* especially in light of the fact that he was representing codefendant Sheldon Davis as well as serving as cocounsel with Barry Slotnick for appellant here, Stuart Cohen, who was as said a defendant in that case. Indeed, appellant received copies of the reports of electronic surveillance containing his voice, having joined in a motion to have them discovered and having consented to the entry of a protective order on December 5, 1972. Thus he had ample opportunity to make his motion prior to the commencement of the instant trial on March 12, 1973. As to the precedence of trial in the Hurok case and this one, while it was apparent that Judge Bonsal had acceded to Judge Bauman's request that the Hurok case go forward first, motions made before Judge Bauman necessitating extended hearings and other matters resulted in adjournment of the case before Judge Bauman until May 29, 1973. Counsel in the present case were notified more than two weeks in advance of trial that trial would commence on March 12, 1973, and immediately prior to trial appellant stated for the record that he had no claim of being rushed to trial and that none of his rights had been denied due to the change in scheduling. There is no showing of good cause for his failure to move before trial pursuant to 18 U.S.C. § 2518(10)(a).

We therefore affirm the judgment. Judgment affirmed.