**UNITED STATES of America,**
**Appellee,**

v.

**Alfredo GARCILASO de la VEGA,**
**Defendant-Appellant.**

**No. 461, Docket 73-2203.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 21, 1973.

Decided Jan. 9, 1974.

Nancy Rosner, New York City, for defendant-appellant.

Daniel H. Murphy, II, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., S. Andrew Schaffer, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

Following a jury trial, appellant Garcilaso was convicted in June, 1973, on a one-count indictment charging him with willfully subscribing under penalties of perjury to an individual income tax return for the year 1966 that he knew to be materially false and incomplete in violation of 26 U.S.C. § 7206(1).[1] The return, which reported his personal income for that year as $2,731, was allegedly false in that it failed to record income that appellant had derived from his narcotics business that year. Garcilaso urges that Judge Ward erred in refusing after a pretrial hearing to suppress the testimony of government witnesses claimed to have been the fruit of unlawful wiretaps and in admitting this testimony at trial. He also argues that the prosecutor impermissibly commented at trial on his exercise of his privilege against self-incrimination and that the evidence as a whole was insufficient to sustain the conviction. Finding these arguments to miss their mark, we affirm.

The story begins in 1966. During September of that year the eyes and ears of a joint federal and state law enforcement team were following the marijuana trafficking of one Juan Santos. On September 2 a New York State Supreme Court order was obtained which authorized the New York City police to tap a telephone at Santos' home.[2] On the basis of an intercepted call between Santos and a would-be buyer, George Jusino, the police on September 28 followed Santos to his source, which turned out to be appellant's apartment. Santos was arrested when he emerged from the apartment carrying a suitcase full of marijuana. The police proceeded to appellant's apartment where they arrested him and found a further supply of marijuana.

The results of the evening's work of the joint team were mixed. Santos pled guilty and received a three and a half year sentence. The prosecution against Garcilaso was dismissed after the evidence of marijuana found in his apartment was ordered suppressed as the fruit of the search of his apartment which, being warrantless, violated his constitutional rights.

Some six years later the indictment in the present case was returned against Garcilaso charging that he knowingly filed a false and incomplete tax return for the year 1966. Garcilaso had reported his principal business activity as the

---

1. The section provides that any person who

    "[w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . "

    shall be guilty of a felony.

2. The government has conceded the illegality of the wiretap under Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

sale of jewelry and declared his 1966 net profit from that activity as $2,731, which was the only income he reported. The government contended that Garcilaso had failed to report additional income from narcotic sales made by him in 1966.

Prior to trial appellant moved to suppress all evidence derived from the concededly unlawful wiretap of Santos' phone and the 1966 search and seizure or, in the alternative, to dismiss the indictment itself as the product of these unlawful acts. The government responded that although it would be unable to produce either the tapes or the logs of the wiretap on Santos' phone because they had been lost or destroyed, it proposed to prove that its income tax investigation and indictment of appellant were derived from a wholly independent source. Thereupon the government introduced Internal Revenue Service chronologs, buttressed by the testimony of a revenue agent, revealing that in 1969 a confidential informer had approached the Service with information of Garcilaso's narcotics dealings and arrest, which was the moving force behind its tax investigation. Although the government had communicated with the informant in 1967 regarding a marijuana tax assessment that might be made against appellant, that case was dropped and it was not until 1969 that the informant approached different revenue agents on her own and furnished the information leading to the present income tax case against Garcilaso. This proof was corroborated by testimony of a revenue agent found credible by the trial judge to the effect that it was not until late 1970, after they had gathered the evidence used to obtain the instant indictment against Garcilaso, that they learned of the illegal wiretap which had

led to the 1966 arrests. The court, crediting the government's evidence, denied the motion to suppress.

At trial the evidence which Garcilaso had sought to suppress was admitted. Juan Santos testified regarding his regular payments to appellant for narcotics purchased in 1966 and a New York City detective corroborated his testimony that some 25 pounds of marijuana seized from Santos on September 28, 1966, had been furnished by appellant. Appellant urges that this testimony should have been suppressed as tainted by the wiretap that led to the 1966 arrests. We disagree. The evidence established that the illegal wiretap was of Santos' phone, not that of appellant, and that the arrest of Santos and appellant resulted from the interception of a call on that line *between Santos and Jusino,* and not from a call to which appellant was a party. On these facts appellant lacks standing to object to the illegal wiretap and the use of its fruits. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). There was some testimony to the effect that, at some time during the monitoring of Santos' phone, calls may have been overheard between Santos and an otherwise unidentified male talking from a phone listed under the name of the appellant's common law wife. Whatever the value of this testimony as a general matter in establishing standing, it can be of no avail in this case, for the court specifically found that it was the Jusino call that led to appellant's arrest. That finding cannot be set aside as clearly erroneous, which is the standard by which we are governed. See United States v. Schipani, 414 F.2d 1262 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970).[3]

---

3. *Because we conclude that appellant's arrest did not result from any violation of appellant's Fourth Amendment rights, we need not specifically address ourselves to the other obstacles that lay in the way of appellant's motion to suppress. Since the trial court further found that the tax case arose from a source that was independent of the*

*1966 wiretap, even if the arrest had resulted from a violation of appellant's rights, the identification of witnesses against the appellant in 1969 and 1970 did not result from an "exploitation" of that illegality. See Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), which also disposes of the argument that any testi-*

Notwithstanding the foregoing proof appellant urges that since the illegal wiretaps have been rendered unavailable to him by their loss or destruction, suppression of evidence allegedly derived from them is mandated by our recent decision in United States v. Huss, 482 F.2d 38 (2d Cir. 1973). We disagree. In *Huss* we ruled that under the "extraordinary circumstances" of that case, 482 F.2d at 46, which were described as *sui generis*," 482 F.2d at 51, the government had failed to sustain its burden of proving that the challenged evidence was derived from an independent, untainted source when the government was unable to produce the tapes or transcripts of the illegal wiretap. Appellant would have us blindly apply this holding as a wooden formula to the present case because the government cannot here produce the tapes of the Santos wiretap. His argument must fail. As we made clear in *Huss*, 482 F.2d at 48, this court was not there establishing a per se rule in favor of the suppression of evidence whenever the government is unable to produce wiretaps. The wisdom of eschewing such an approach is highlighted by the very differences between *Huss*, which presented a set of aggravating circumstances bordering on governmental misconduct, and the present case, which does not. In *Huss* numerous conversations of the challenging party had been overheard on the FBI wiretap. The destruction of the tapes of these conversations appeared suspicious because the FBI had elsewhere made the representation that it was their policy to preserve such tapes and the federal wiretap statute mandated that they be warehoused.[4] Most damaging to the government's cause, moreover, was the improbable claim of an independent source, which was thoroughly undercut by an admission of the government's principal witness that wiretaps were the real source of the evidence and leads. The failure to produce the tapes in *Huss,* if countenanced by this ·court, would have served only to insulate from scrutiny a story that had already become the object of well-founded doubts.

The present case does not share these essential *Huss* hallmarks. The government has in this case, unlike *Huss*, made a creditable showing of an independent, untainted source. The evidence that an unidentified male voice participating in some conversations may have been appellant was tenuous at best. The Internal Revenue Service chronologs and the testimony of the revenue agent attest to the fact that the investigation of the appellant's tax return was prompted by information supplied by a confidential informer and that Santos was interviewed by two revenue agents before they knew of the 1966 wiretap on his phone.[5] Moreover, the wiretaps were conducted not by the federal government but by · the New York City police under a state law that did not require the preservation

mony concerning the 1966 arrest, no matter how obtained, is tainted because the arrest itself would not have occurred but for the illegal wiretap. See also United States v. Friedland, 441 F.2d 855, 860 (2d Cir.), cert. denied, 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed. 2d 111 (1971).

4. Section 802 of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(8)(a), provides that such records shall not be destroyed except by order of the court and that they shall in any event be kept for 10 years.

5. The appellant made some effort at the suppression hearing to refute the government's proof of an independent source, but with no success. He pointed to the fact that the In-

ternal Revenue Service chronologs indicated that the Service approached the confidential informer in 1967, two years before the informer is alleged to have spontaneously contacted the Service. The prosecutor ex· plained this apparent discrepancy to the court's satisfaction. In 1967 the government had considered bringing a marijuana tax assessment case against Garcilaso and in this regard communicated with the informer. The government files indicate that this investigation was dropped—probably because the marijuana had been illegally seized in the first instance. In 1969 the informer came to different agents on her own and gave them information that led to their initiation of the income tax case against appellant.

of such tapes.[6] Thus we do not face the destruction of tapes under the suspicious circumstances that characterized *Huss.* In the context of this case we decline to penalize the federal government for the loss of tapes held by a state agency six years before, the government having made a strong showing of an independent, untainted source.[7]

Garcilaso also argues that the prosecutor impermissibly commented on his exercise of his privilege against self-incrimination. The argument seems to be that the prosecutor referred to Garcilaso's failure to report that marijuana sales were the source of additional income. The passing elliptical reference occurred during the prosecutor's summation.[8] The theory of the government's case, as propounded by the prosecutor, was that Garcilaso violated § 7206(1) by his failure to report his additional income, not by his failure to report that narcotic sales were the source of this additional income. In proving its case against Garcilaso the government was required to establish the existence of income from narcotic sales in order to show that he had unreported income. The prosecutor referred to this evidence merely as probative of an essential element of the government's case, the existence of unreported income. A taxpayer's intentional nondisclosure of income is not excused because it is derived from criminal activities. See United States v. Knox, 396 U.S. 77, 82, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969). In any event the charge of the trial judge made it clear to the jury that it was the failure to report income, not the failure to report the source of the income, that constituted the violation of § 7206(1):

> "Nevertheless, if you find or have any reasonable doubt that the defendant correctly declared the total amount of his income from all of his business transactions and activities, defendant's failure to declare that he was engaged in an illegal business and his failure to name that business is not by itself a material misstatement upon which you can find the defendant guilty."

Finally, we find no merit in appellant's argument that the evidence *in toto* was insufficient to establish that he made more income than he reported. The proof of appellant's proceeds from narcotic sales and of his disbursements for rent and repairs makes it abundantly clear that his tax return omitted a substantial amount of his actual income.

The conviction is affirmed.

---

6. The predecessor of the New York warehousing provision, CPL § 700.55, was not enacted until May 26, 1969, effective June 25, 1969.

7. As a corollary to his *Huss* argument, the appellant maintains that the trial court erred in compelling Santos to testify over a Fourth Amendment objection. At first, Santos balked at testifying; the court granted him immunity and he then went on to testify. Even if Santos' initial reticence was prompted by a concern for his Fourth Amendment rights—and it is not at all clear that it was—Garcilaso would have no standing to object to the introduction of the testimony. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

8. In speaking of the four elements of an offense under § 7206(1), the prosecutor said: "Third element. It is not complete. We know it is not complete. Why? Because Mrs. Mann talked about the money the man had. The other sources of money he had. And Detective Delgado and Juan Santos talked about where he got that money, *what kind of business he was in.* Makes it incomplete." (Emphasis added).