**UNITED STATES of America ex rel. Richard CONROY, Petitioner,**

v.

**Roy BOMBARD, as Superintendent of Green Haven Correctional Facility, Respondent.**

**No. 76 Civ. 2329–CSH.**

United States District Court, S. D. New York.

Nov. 23, 1976.

J. Roger Lane, New York City, for petitioner.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent by Asst. Dist. Attys., Peter L. Zimroth, Roanne L. Mann and Robert M. Pitler, New York City.

## MEMORANDUM AND ORDER

HAIGHT, District Judge:

Petitioner Richard Conroy, currently incarcerated in a New York State prison, having been sentenced to life imprisonment for murder in the first degree, has brought this petition for habeas corpus pursuant to 28 U.S.C. §§ 2241 and 2254, alleging violations of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

Subsequent to the filing of the petition, but prior to decision, the Supreme Court of the United States has decided *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). That case substantially restricts the remedies available to state court prisoners in the federal district courts in cases of this nature; and the case at bar has necessarily been analyzed within the context of *Stone v. Powell.*

This Court has reached the conclusion, for the reasons set forth in the following opinion, that the petition for habeas corpus must be dismissed.

### I.

*The Factual Background*

On April 14, 1964, Charles Gallagher, an Associate Professor of Physics at Columbia

University, left his home sometime between 7:30 and 8:00 p. m. after dining with his wife and children. The following morning at 6:00 a. m., Professor Gallagher's body was discovered hidden behind a group of bushes in Central Park. A subsequent autopsy disclosed that his death, which had occurred between 8:30 and 9:30 the preceding night, had been caused by a single bullet.

An intensive investigation into the homicide and the surrounding circumstances was undertaken by the New York County District Attorney's Office and by members of the New York City Police Department. This investigation yielded no results. On April 29, 1966, an investigator in the Queens County District Attorney's Office received an anonymous phone call. The substance of that call was to state that Peter Butler and Richard Conroy were involved in the murder of Charles Gallagher and that Conroy had confessed to one Lynne Richardson. The contents of the conversation were relayed to the New York County District Attorney's Office, by telephone and in writing.

Assistant District Attorney John F. Keenan, in charge of the New York County investigation, evaluated the information received by the anonymous call, and devised a strategy aimed at accumulating additional evidence regarding the guilt of Conroy and Butler. On June 28, 1966, a warrant to eavesdrop on Conroy's telephone was obtained from Justice Gerald J. Culkin, Supreme Court, New York County. In addition, copies of a bogus newspaper article dealing with the Gallagher murder were mailed to Conroy and Richardson, in the hope of stimulating discussions about the homicide. When that first order expired on July 15, 1966, the police continued to eavesdrop without judicial authority. On July 18, 1966, a second eavesdropping order was obtained. Before the warrants were issued, and during their existence, New York City detectives investigated the backgrounds of Butler, Conroy, and Richardson.

Butler and Conroy were subsequently indicted for murder in the first degree. At the commencement of their trial, counsel for the defense sought a hearing for the purpose of determining whether probable cause existed for the wiretap orders, and whether any evidence or leads had been uncovered as a result of the wiretapping. The prosecution responded that there had been probable cause for both warrants, and that no evidence or leads had resulted. The trial court, determining that there had been probable cause, declined to hold a hearing.

At the trial, several friends of the defendants recounted admissions defendants had made to them about the Gallagher murder. Both defendants were convicted of murder in the first degree, as a felony murder committed during the course of an attempted robbery. On June 15, 1967, they were sentenced to life imprisonment.

Following conviction, Conroy and Butler appealed to the Appellate Division, First Department, arguing that they were entitled to a hearing for the purpose of determining the validity of the wiretap warrants, as well as to discern whether any leads had been developed as a result. Petitioner Conroy asserted then, as he has throughout the litigation, that information obtained by illegal wiretapping, and not disclosed to him, was used to discover and coerce witnesses. In addition, Conroy challenged the sufficiency of the evidence of his guilt.

The People responded by arguing that the Petitioner's guilt had been proven beyond a reasonable doubt. However, the People did agree that Petitioner Conroy was entitled to a hearing on the wiretap issues. Further, the People conceded the invalidity of the second eavesdrop order, and also conceded that the period of wireless interception was improper. The People maintained, however, that the first order was valid, and, that in any event, no evidence or leads had been obtained through any of the interceptions.

On November 20, 1969, the Appellate Division, First Department, ruled that Conroy was entitled to an evidentiary and suppression hearing in accordance with *People v. Morhouse*, 21 N.Y.2d 66, 286 N.Y.S.2d 657,

233 N.E.2d 705 (1967) and *People v. Munger,* 24 N.Y.2d 445, 301 N.Y.S.2d 39, 248 N.E.2d 882 (1969). The First Department ordered the hearing court to determine the legality of the first order, and to determine whether any witnesses and evidentiary matter developed at trial stemmed from any of the illegal interceptions. *People v. Butler and Conroy,* 33 A.D.2d 675, 305 N.Y. S.2d 367 (1st Dept. 1969). The First Department upheld the conviction of Peter Butler, and held that he lacked standing to contest the wiretaps, and was thus not entitled to a hearing. *Aff'd, People v. Butler,* 28 N.Y.2d 499, 318 N.Y.S.2d 943, 267 N.E.2d 587 (1971).

The hearing thus ordered commenced May 26, 1970, before Justice Davidson, who had been the trial judge. At the beginning of the hearing, the People gave defense counsel certain tape recordings of conversations which had been intercepted during the investigations. However, several of the original tapes had been erased and reused during the wiretapping period, and one entire tape was inexplicably missing. As substitutes for these missing and erased tapes, the People provided the defense with "logs" —summaries of those tapes, compiled by the individuals who had monitored the interceptions. At the hearing, the People presented the investigatory personnel, and the trial witnesses whom Petitioner alleged, then and now, were discovered through illegal wiretaps. These witnesses testified that their trial testimony had not resulted from coercion, and that they had been unaware of any wiretapping at the time they made their statements to law enforcement officials. The Petitioner argued at the hearing that the possibility of taint had been suggested by certain obscure statements made by law enforcement officials and other witnesses, and that the absence of the tapes, which prevented effective pursuit of the taint question, may have been due to bad faith.

Justice Davidson, however, found beyond a reasonable doubt that the People's evidence was obtained independently of any wiretapping. Petitioner appealed this rul-

ing to the First Department, which affirmed the judgment of conviction. *People v. Conroy,* 41 A.D.2d 805, 341 N.Y.S.2d 875 (1st Dept. 1973). Petitioner appealed to the Court of Appeals, which affirmed unanimously. 34 N.Y.2d 917, 359 N.Y.S.2d 551, 316 N.E.2d 868 (1974).

Conroy then petitioned this court for a writ of habeas corpus, pursuant to 28 U.S.C. §§ 2241 and 2254, alleging that his conviction was obtained in violation of his rights under the Fourth, Fifth and Fourteenth Amendments, basing his argument upon the use against him of evidence obtained as a result of an illegal wiretapping, in contravention of the Fourth Amendment's prohibition against unreasonable searches and seizures.

Subsequent to the filing of Conroy's petition in this court, but prior to decision, the Supreme Court rendered its opinion in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), restricting the jurisdiction of the district courts over habeas corpus applications based on such Fourth Amendment claims. Supplemental briefs addressing the effect of *Stone v. Powell* were requested and were submitted by the parties in the case at bar.

In *Stone v. Powell, supra,* the Supreme Court held that:

" . . . [W]here the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Id.* at 428 U.S. 465, 96 S.Ct. at 3052. See also *id.* at 3046.

### II.

*Petitioner's Non-Fourth Amendment Claim*

▬ Petitioner's claim that his conviction is not supported by sufficient evidence is dismissed as being without merit. His contention that the People failed to sufficiently prove that an attempted robbery was committed is both frivolous and beyond the scope of federal habeas corpus review.

The claim that a conviction for felony murder was not supported by sufficient evidence of a predicate felony is essentially a question of state law and does not rise to federal constitutional dimensions unless there was *no* proof whatever of the crime charged. *United States ex rel. Terry v. Henderson,* 462 F.2d 1125, 1131 (2d Cir. 1972), *Gregory v. City of Chicago,* 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), *Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Conroy's confessions to his friends, corroborated by the finding of the body, death having been caused by a bullet wound, clearly provided an evidentiary basis for the conviction of felony murder, the underlying felony being attempted robbery. The corroborated confessions, related by several witnesses, were accepted by the jury and the conviction was ultimately affirmed by the highest state court. I find no basis for disturbing those findings of fact.

### III.

*Petitioner's Claim that the First Wiretap Order was Illegal*

■ The validity of the *first* wiretap order, issued June 28, 1966, has been sustained at every stage of litigation. Petitioner does not allege any procedural defects which precluded the hearing court from properly adjudicating the claims of illegality. Rather, he argues that his "right to a fair hearing was further subverted by the court's clearly erroneous ruling on the legality of the first wiretap order—due undoubtedly to the court's ignoring evidence indicating falsehoods and cover-up attempts by the prosecution." (Pet. Brief at 20). However, all of the New York courts which examined that question found otherwise. The original Appellate Division order mandating a hearing found that as to the first order, "there may be a bare sufficiency of facts, independent of the anonymous phone call, to establish a basis for the reliability of the information divulged by the masked informer and thus sustain this order and preserve it from the interdiction of *People v. Horowitz,* 21 N.Y.2d 55, 286 N.Y.S.2d 473,

233 N.E.2d 453 (1967)." *People v. Butler and Conroy,* 33 A.D.2d 675, 305 N.Y.S.2d 367 (1st Dept. 1969). Nonetheless, the hearing court, which reexamined the issue, could have declared the first order invalid. Instead, it affirmed the validity of that order, and was in turn affirmed by the Appellate Division and the Court of Appeals. *People v. Conroy, supra.*

Upon analysis, and in essence, Petitioner does not contend that the opportunity to be heard was not full and fair. Instead, he asserts that the hearing was unfair because the court interpreted the facts differently than Petitioner would have preferred, and issued a ruling contrary to Petitioner's posture. Petitioner Conroy now seeks to relitigate this matter on writ of habeas corpus. It is precisely this manner of claim which the district courts, under *Stone v. Powell,* are precluded from hearing:

"In sum, we hold only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review. Our decision does not mean that the federal court lacks jurisdiction over such a claim, but only that the application of the rule is limited to cases in which there has been both such a showing and a Fourth Amendment violation." *Id.,* 428 U.S. 495, 96 S.Ct. at 3052 n. 37.

The policy considerations which led the Court to adopt such a restriction shall be discussed in appropriate depth as regards Petitioner's cognizable claim. In dismissing his challenge to the first order, it is sufficient to state that Petitioner cannot now present, or attempt to present, a Fourth Amendment violation, and, even if he could make such a showing, he does not express even the barest claim of denial of a full and fair hearing on this issue. *Stone v. Powell* precludes the district court from such re-examination where the opportunity to be heard was full and fair. The unsubstantiated imputation of unfairness by a litigant disappointed with the court's result is not a

sufficient ground for reopening the matter. Accordingly, in light of *Stone v. Powell*, there is only one cognizable claim which Petitioner may present to this court. This cognizable claim is Petitioner's allegation that the post-trial hearing, as addressed to the issue of taint resulting from the concededly illegal surveillance, did not constitute "an opportunity for full and fair litigation" of the Fourth Amendment claims. *Stone v. Powell, supra*, at 3046, 3052.

### III.

### *The Cognizable Claim*

As stated, there is one claim not precluded by *Stone v. Powell*. This claim actually consists of several related objections, going to the fullness and fairness of the opportunity to be heard. Aside from ruling on the validity of the wiretap orders, the hearing was supposed to ascertain whether any of the illegal wiretapping had directly or indirectly provided witnesses, evidence or leads which were subsequently used against Petitioner at his trial.

The Petitioner alleges in his initial brief and in his post-*Stone v. Powell* supplement, that various deficiencies in disclosure by the People, as well as various restrictions imposed by the trial judge, prevented a full and fair hearing on the issue of tainted evidence flowing from the unlawful wiretaps. Since the People have conceded the illegality of the second wiretap, and of the warrantless wiretapping, Petitioner has satisfied the requirement of showing a Fourth Amendment violation. *Stone v. Powell*, 96 S.Ct. 3052 n. 37. It now remains for this court to decide whether he was also denied a full and fair opportunity to litigate the question of tainted evidence used directly or indirectly at trial. In deciding that question, this court may examine the surface claim, by probing and considering in detail the specific instances Petitioner presents in support of his argument that the hearing was less than full and fair. *Stone v. Powell*

precludes habeas corpus relief if the Petitioner's claim is rejected.

To substantiate his broad cognizable claim that the hearing was procedurally defective, Petitioner advances three specific arguments. First, he maintains that the People denied him the opportunity to examine relevant and necessary material which he was entitled to examine under *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) and its progeny, and that this non-disclosure prevented him from demonstrating the existence of taint. Second, Petitioner alleges that these tapes were unavailable because of bad faith on the part of law enforcement officials, and that such bad faith negates any argument the People might make as to why the wiretap materials were incomplete. Third, he contends that the hearing court's restriction on his right to cross-examination prevented him from showing bad faith, knowledge by the law enforcement officials of the illegalities at the time of the wiretaps, and a subsequent cover-up of that bad faith. Such curtailment, he argues, constituted a denial of a full and fair opportunity to be heard.

■ *Stone v. Powell* restricts a state prisoner's federal habeas corpus relief for Fourth Amendment claims to those instances where the state failed to provide an opportunity for full and fair litigation. 428 U.S. 495, 96 S.Ct. 3052. Thus, in the instant case, the threshold issue must be the definition of a "full and fair" hearing.[1]

The Supreme Court has enunciated its views on the right to a suppression hearing by a party alleging unlawful electronic surveillance and subsequent use of information obtained in such a "tainted" manner. *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). *Alderman* was decided after Petitioner's conviction, but before the taint hearing. Accordingly, it is *Alderman* and its subsequent applications which must provide the guidelines for determining what constitutes a full and fair

1. The Supreme Court in *Stone v. Powell* did not define the "full and fair litigation" concept. Accordingly guidelines must be sought in other decisions of the Court and of the courts of appeals, particularly the Second Circuit.

hearing in regard to Petitioner's cognizable claim.

▮ The *Alderman* holding may be summarized as follows: if a petitioner in a wiretap suppression hearing has standing, and there has been illegal surveillance, the government must disclose to him the records of those overheard conversations which the government was not entitled to use in building their case against him. The Court ruled that the hearing must be more than a mere formality. It must be an adversary hearing to determine taint. An *in camera* or an *ex parte* examination will not suffice. The defendant must be enabled to go forward with specific evidence demonstrating taint; thus, the government is required to produce for the defendant's examination the tapes, transcripts and records of a defendant's overheard conversations. Additionally, the government must produce the agents responsible for the investigation so that the defendant may cross-examine them regarding dissemination of the illegally-obtained information. The New York State cases cited by the First Department's order for a hearing are in accord. *People v. Morhouse*, 21 N.Y.2d 66, 286 N.Y.S.2d 657, 233 N.E.2d 705 (1967), *People v. Munger*, 24 N.Y.2d 445, 301 N.Y.S.2d 39, 248 N.E.2d 882 (1969).

▮ Petitioner Conroy certainly has standing to pursue the issue of taint. He is an aggrieved party, since the government has admittedly overheard his conversations by the use of illegal electronic surveillance. *Alderman*, 394 U.S. pp. 177–80, 89 S.Ct. 961; *Silverman v. United States*, 365 U.S. 505, 511–512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Furthermore, the *Alderman* dictates are directly applicable to the Petitioner's assertion regarding the prosecution's duty to provide adequate disclosure, and of the aggrieved party's right to cross-examination.

Thus, this court may rely upon *Alderman* and its progeny for guidance in evaluating the Petitioner's broad claim that the State of New York did not provide an adequate forum to litigate his Fourth Amendment claim. The first relevant point raised by Petitioner is that the destruction of the recordings of the illegal wiretaps prevented him from establishing that trial evidence was derived from that illegality. In essence, Conroy argues that *Alderman* requires him to come forward with evidence of taint, and that he was unable to meet that burden because the People failed to provide him with certain recordings, verbatim transcripts, or adequately-detailed logs.

▮ The argument Petitioner advances as to the effects of those non-disclosures is lengthy and detailed, but it must be examined if there is to be a meaningful pursuit of the "full and fair" concept. Conroy maintains that the People's failure to supply him with the material in issue constituted a violation of the disclosure requirements of *Alderman* (in addition to, and directly related to, his inability to meet his own burden of showing taint). Petitioner asserts that when tapes are destroyed, and there are no transcripts, then incomplete logs and non-detailed summaries, as were provided him, are sufficient only where the prosecution is able to prove, by testimony or otherwise, that the existing logs, made available to the defendant, were also the only records of the conversations made available to the agents who investigated the case. Furthermore, he contends that the prosecution must show that the monitors—those agents responsible for preparing the logs—did not communicate anything other than the contents of the logs to the investigators. In this case, the agents who acted as monitors were also the agents who obtained, from witnesses, certain statements used against Petitioner at his trial. Thus, Conroy argues that the destruction of the tapes without adequate substitutes effectively foreclosed him from demonstrating that evidence tainted by the illegality was used to coerce witnesses and/or to develop leads.[2]

---

2. In point of fact, once the petitioner makes a *prima facie* showing of taint, the government bears the burden of showing that the conviction was procured by untainted evidence. The

To support this proposition, Petitioner relies upon *United States v. Huss*, 482 F.2d 38 (2d Cir. 1973). He cites *Huss* as holding that when the government prevents a party aggrieved by an illegal search and seizure from obtaining full disclosure of all relevant material, then the suppression hearing is merely *ex parte,* and prohibited by *Alderman.* Should this court adopt Petitioner's reading of *Huss,* it would be tantamount to holding that whenever there has been illegal wiretapping, and the government cannot make full disclosure of all conversations to which a party is entitled to have disclosed, then the government fails in its disclosure requirement, and the defendant is blocked from making the prima facie case of taint which *Alderman* requires. Pursuing this logic further, the government should not be permitted to demonstrate that trial evidence is not tainted, since the inadequate disclosure prevents the defendant from showing otherwise. There could be no *Alderman* hearing under such circumstances. Thus, Petitioner's argument, if accepted, would mean that when the records of an illegal wiretap are not available, the indictment would invariably be dismissed, since the trial evidence could never be shown to be untainted.

A proper reading of *Huss* demonstrates that Petitioner is in error. In *Huss,* there had been an illegal wiretapping which was conducted without any judicial sanction. The tapes were destroyed despite the normal government rules requiring their preservation. No apparent reason existed for the destruction. Beyond the non-availability of the tapes or of any transcripts (only summary logs were provided), the *Huss* case presented a fact pattern which the Second Circuit, in a later case, referred to as "aggravating circumstances bordering on governmental misconduct." *United States v. Garcilaso de la Vega*, 489 F.2d 761, 764 (2d Cir. 1974). In *Huss,* the government not only failed to sustain its burden of proof that the evidence adduced was not the product of the illegal tap, but, to compound matters, an agent ostensibly testifying as to an independent source admitted that the illegal taps were in fact the real source of the leads which were being challenged.

The *Garcilaso* case, *supra,* demonstrated that *Huss* was limited to its surrounding circumstances of repeated non-compliance with proper conduct, lack of an independent source, and questionable good faith on the part of the government. In *Garcilaso,* the Second Circuit held that loss of the records of an illegal wiretap—neither tapes nor logs were available—did not require suppression of the evidence allegedly derived from the wiretap, provided the government made a strong showing of an independent, untainted source. Also of importance is the law under which the wiretapping in *Garcilaso* was conducted. Like the case at bar, the wiretapping in *Garcilaso* was ostensibly guided by a New York statute which did not require the preservation of such tapes. 489 F.2d 764–65. The wiretapping in *Garcilaso* and in the instant case occurred in 1966. The element of bad faith and an unexplained destruction, present and crucial in *Huss,* cannot be inferred in Conroy's case. Operating under a statute which did not require preservation, the state monitors assert they re-recorded tapes due to a shortage, and that determination has been supported in the state courts.

As *Garcilaso* noted, the crucial factor in taint hearings will ultimately be the existence of an independent, untainted source. The Second Circuit follows this rule, and it is expressed in *Huss* and *Garci-*

---

general rule is stated in *Alderman v. United States, supra,* at 394 U.S. p. 183, 89 S.Ct. p. 972:

"The United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners acknowledge that they must

go forward with specific evidence demonstrating taint."

Accordingly, Conroy's argument in the case at bar may assume a burden which the law does not place upon him. As appears from the decision *infra,* the People conceded Conroy's showing of taint, and assumed the burden placed upon them by *Alderman.*

106

*laso.* This independent source rule was enunciated by the Supreme Court in *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In *Nardone,* the Court held that when a wiretap is illegal, the accused must be given an opportunity to prove that a substantial part of the evidence used against him was fruit of the poisonous tree, and the government may counter by convincing the trial court that the proof had an independent origin. *Id.* at 341, 60 S.Ct. 266. The *Alderman* court approved this same concept in stating:

. "The question as stated in *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, is 'whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Alderman v. United States, supra,* 394 U.S. at 181, 89 S.Ct. at 970.

█ The hearing court concluded that, despite the illegal wiretapping, there were independent, untainted sources of the evidence which led to Petitioner's conviction. These independent sources consisted, to a great extent, of the testimony of several trial witnesses who were deemed to have acted voluntarily, free from coercion. So long as the state hearing was full and fair, this district court is precluded from upsetting that determination. Since the Petitioner has presented no demonstrable evidence that the desired material was not provided because of bad faith, the hearing court's finding of lack of taint and its finding of an independent, untainted source must stand. The *Huss* decision is not to be construed as automatically applicable to cases of non-disclosure; rather, it is an admonition against non-disclosure due to bad faith, compounded by the absence of any independent, untainted source of the evidence. *Garcilaso,* with its emphasis on independent source, where neither tapes nor adequate substitutes are available, but not because of bad faith, represents the rule followed in the Second Circuit, as well as the Supreme Court view.

The Second Circuit has held that the government's burden of proof on the issue of an independent source is proof by a preponderance of the evidence. *United States v. Falley,* 489 F.2d 33 (2d Cir. 1973), *United States v. Cole,* 463 F.2d 163 (2d Cir. 1972). Both of these cases deal with the question of what the prosecution must demonstrate in order to prove the existence of an independent source of the evidence, untainted by the Fourth Amendment violation. In each case, the Second Circuit required that the prosecution show that the investigation which developed the evidence leading to conviction, and which is then offered as an independent source, would have been launched aside from any evidence gathered by the illegal surveillance. In the case at bar, the state hearing court was satisfied that the incriminating evidence stemmed from an investigation prompted by an anonymous phone tip. Once again, a full and fair opportunity to litigate the issue of an independent source forecloses this court from re-examining the matter.

█ Further, it should be noted that in the Second Circuit, the successful demonstration of an independent source can attenuate certain degrees of primary taint stemming from an illegal wiretap. *United States v. San Martin,* 469 F.2d 5 (2d Cir. 1972). In *San Martin,* there was an illegal wiretap which the appellant argued had ultimately led to the evidence which convicted him for narcotics offenses. The illegal wiretap contained nothing incriminating on its face, and it was not offered in evidence. The appellant had been called by a co-conspirator who had unknowingly used the illegally tapped phone. The co-conspirator was then arrested and agreed to cooperate. The Second Circuit upheld the admissibility of the co-conspirator's testimony, stating that the police had had an independent basis for arresting him, based on prior investigation, and that he had voluntarily agreed to cooperate without knowledge of the wiretap. In holding that there was thus an independent source for the evidence

adduced at trial, the Second Circuit stated that "even if there were a poisoned tree (the wiretap) from which the Government plucked some fruit, it had an alternate healthy tree from which to eat." *United States v. San Martin, supra,* at 8.

Accordingly, it is clear that so long as the state hearing court found an independent source of the evidence, and so long as the Petitioner failed to demonstrate bad faith as in *Huss,* the unavailability of the tapes at the hearing was not fatal to the prosecution. The independent source, found by the hearing judge, attenuated any taint which may have been on the tapes. The Second Circuit rule enunciated in *Huss* and *Garcilaso, supra,* lead to the inescapable conclusion that the People's innocent failure to provide all the relevant material does not, in and of itself, prevent a full and fair *Alderman* hearing. In this case particularly, the unavailability of the tapes did not prejudice Petitioner. While a defendant at an *Alderman* hearing must present a prima facie showing of taint, *Alderman v. United States, supra,* 394 U.S. at 183, 89 S.Ct. 961, the hearing court assumed that Petitioner had fulfilled that burden and went directly into the ultimate question of whether the People had sustained their burden of proof that the trial evidence was not derived from the wiretapping.

▮▮▮▮▮ Thus, Petitioner cannot succeed upon his claim that failure to supply the tapes rendered the hearing defective by *Alderman* standards, and less than full and

fair, which would allow the district court to circumvent the restrictions imposed by *Stone v. Powell, supra.* Similarly, this court must reject Petitioner's argument that the unavailability of the tapes was inexcusable because the investigating agents were the same agents who had monitored the tapes. Petitioner attempts to support his contention on the basis of *United States v. Giordano,* 440 F.2d 449 (6th Cir. 1971). That case does in fact state Petitioner's contention that logs will be deemed an adequate substitute only if the government proves that such logs were the only records of the conversations made available to the investigating agents, and that the agents who actually prepared the logs (the monitors) did not communicate any other information to the investigators. *Giordano* addresses the question of the additional disclosure the government must make, where the original tapes are not available. The Sixth Circuit appears to take the view that, in such a case, the government must produce the monitoring and investigating agents for cross-examination by the petitioner on the extent of dissemination of the fruits of the illegal surveillance; and that, failing production of such witnesses, the petitioner must prevail.[3] It is doubtful that the Second Circuit would go so far. As the cases cited *supra* demonstrate, the controlling question in the Second Circuit is the ability of the prosecution to prove an independent source of the allegedly tainted evidence.[4] New York state courts are in accord. *People v. Mendez,* 28 N.Y.2d 94, 320

---

**3.** The precise holding in *Giordano* appears at 440 F.2d p. 451:

"In the instant case, the record does not disclose whether information other than that disclosed in the 'logs' was transmitted to those responsible for investigating the Appellant's case. The Government did not call the 'monitors' as witnesses, hence, there is no evidence whether they communicated material to the investigators that was not contained in the 'logs.' Nor did the Government produce, for the defendant to cross-examine, the agent in charge when the illegal monitoring took place. Only he could testify as to the extent of dissemination of whatever illegal surveillance that was communicated to him. In addition to the complete records of the surveillance, the defendant had 'the right

to cross-examine the appropriate officials in regard to the connection between those records and the case made against him.' 394 U.S. at 185, 89 S.Ct. at 973. The case must be remanded to allow the Appellant to cross-examine these individuals. If the Government does not come forward with them, then the District Court will have no alternative but to dismiss the proceeding and enter judgment for the Appellant."

**4.** Thus in *United States v. Garcilaso, supra,* the illegal tape was destroyed; there were no logs or transcripts; neither the monitoring nor investigating officers were called to testify; and the government prevailed because entirely different revenue agents were able to demonstrate an independent source of evidence. See discussion at 489 F.2d pp. 764–5.

N.Y.S.2d 39, 268 N.E.2d 778 (1974). Thus, Petitioner's allegations that the tapes were unavailable because of bad faith are really complaints about the hearing result, not the procedure. He had the opportunity to argue his point at the state hearing; after examining the facts, the hearing court disagreed.[5]

 Petitioner does allege that he was prevented from showing bad faith because the hearing court curtailed his cross-examination of various law enforcement personnel. The defense attorney representing Conroy at the hearing sought to cross-examine certain assistant district attorneys and police officers to determine if they knew the wiretaps were illegal at the time the tapes were erased or destroyed. Specifically, Petitioner objects to the curtailment of his cross-examination of Assistant District Attorney Keenan, who had headed the New York County investigation. The defense was attempting to discern whether District Attorney Frank Hogan had himself subscribed the renewal (second) application, and whether Mr. Keenan had himself read the application.

I do not find that the curtailment of the defense cross-examination of Mr. Keenan prevented a full and fair hearing. The People had already conceded the illegality of that order, and the justification for pursuing the curtailed line of questioning was that the defense could demonstrate that the police, acting in bad faith, circumvented Mr. Hogan because they knew he would never approve the application. This same argument was advanced as the basis for the questioning, curtailed by the hearing court, of Assistant District Attorney Lankler and Police Lieutenant Sullivan, who had been involved in that insufficient application. The defense argued then, as Petitioner does

today, that only bad faith could explain the actions of these officials, since any reasonable law enforcement person would have known the orders could not stand. Thus, Petitioner asserts, these officials knowingly avoided showing the application to Mr. Hogan, whose known integrity would have prevented him from condoning such a legal deficiency. The hearing court sustained the People's objections to these questions. The court has the discretion to do so when, as in the instant case, the very relevance of such questions are at issue. *United States v. Kahn*, 472 F.2d 272 (2d Cir. 1973).

The Petitioner contends that the hearing court's curtailment of his attempts to elicit proof of bad faith prevented a full and fair opportunity to litigate his Fourth Amendment claims. However, that very assertion—that the tapes were unavailable because of bad faith by law enforcement officials—was, at best, a rather tenuous theory. There is nothing in any of the records to demonstrate that the police, in 1966, knew that the second order was deficient. At that time, the modern guidelines for establishing probable cause for a search warrant had not yet been clearly set down, as they would be a few years later in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). There were no laws requiring preservation of tapes, and the specifies of a wiretap hearing, mandated by *Alderman*, could not have been foreseen by the officials. A hearing court and two appellate courts have been satisfied that the standards in existence in 1967 had been satisfied. *Stone v. Powell, supra,* requires a showing of a denial of a full and fair hearing in order for this court to grant relief. All that Petitioner does is present an unsubstantiated inference of bad faith. That inference could only be drawn today if this court accepted, as evidence, the very conclu-

5. I do not overlook the fact that, unlike *Giordano* and the cases cited in the Second Circuit, the monitoring and investigating agents were the same individuals. Consequently the "extent of dissemination" of the illegal surveillance, in *Giordano's* phrase, was, as between monitor and investigator in the case at bar, total and immediate. However, that circumstance does not prevent a full *Giordano*-like cross-examination of the officers involved; it only means that there are fewer officers to examine. Neither does the performance by the same officers of monitoring and investigative duties prevent those officers from testifying, as they did in the case at bar, that the illegal wiretaps were fruitless, and that the arrests were based on independent evidence. The hearing court accepted that testimony.

sion Petitioner attempts to prove. In other words, if bad faith is accepted, unchallenged, and unsupported, at the beginning of the argument, then every bit of supporting evidence will be explained by bad faith. Faced with such a remotely plausible claim, supported only by circular reasoning, it cannot be said that the hearing court abused its discretion in putting an end to the matter.

## IV.

### *The Policy Factors Guiding the District Court*

The Court in *Stone v. Powell, supra*, did not specify with any degree of precision what would constitute a full and fair hearing. Accordingly, each set of facts will require a determination of the appropriate criteria. *Alderman* and its progeny established guidelines for determining the fullness and fairness of a hearing held for the purpose of examining the issue of taint from an illegal surveillance. A diligent and thoughtful reading of *Powell* leads to the conclusion that the Court intended that there are to be few situations where a district court should find that a petitioner was denied an opportunity for a full and fair hearing in the state court. This conclusion becomes even more apparent after a careful analysis of the policy considerations which the Court espoused in adopting the limitation on habeas corpus relief for Fourth Amendment claims.

In its opinion, the Court twice cited in footnotes an article written by Professor Bator, titled *Finality in Criminal Law and Federal Habeas Corpus Review for State Prisoners*, 76 Harv.L.Rev. 441 (1963). 96 S.Ct. 3042 n. 7, 3052 n. 35. In referring to this article, the Court embraces the author's view that there exists no apparent reason to believe that modern state court judges are any less diligent that federal judges in hearing and deciding search and seizure claims (96 S.Ct. 3052 n. 35). Professor Bator, in the article, asserted that state court determinations, in relation to federal habeas corpus proceedings, should remain undisturbed unless the state did not provide "a

reasoned method of inquiry into relevant questions of fact and law . . . ." Bator, *supra*, at 455, see generally, 455–60. This was but another manner of expressing the essence of the decision rendered in *Stone v. Powell*. Professor Bator defined a meaningful state process as "one forum concededly unbiased using procedures concededly rational". *Id.* 456 n. 26. Professor Bator presents, as examples of forums failing this test, instances where the judge was bribed, or the process contained no opportunity to raise the claims. *Id.*

Petitioner Conroy does not allege that there were not rational procedures available for the presentation and litigation of his Fourth Amendment claims. He does not assert that the hearing court judge was unfair in the sense that he was plainly biased, improperly compromised, or otherwise unable to fairly decide the issues. Just as one would have to accept Petitioner's conclusions of bad faith by law enforcement officials in order to accept the contention offered to prove that very conclusion, one would likewise have to accept the conclusion that the hearing judge was unfair in order to accept the examples Petitioner offers in support of that allegation.

Petitioner has not demonstrated that the available state procedures were inadequate or otherwise prevented him from presenting his claims, nor has he shown that the conduct of the hearing judge circumvented those procedures. Instead, he maintains that the hearing court's conclusions were incorrect, and he urges that rulings more favorable to his position be imposed on the state court by a federal court. Aside from the lack of merit in this suggestion, the Supreme Court's policy as to the exclusionary rule and habeas corpus, set forth in *Stone v. Powell*, militates against such action by a district court.

The Court held that the exclusionary rule, established in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), is to be applied where it would effectively deter police conduct which violates an individual's Fourth Amendment rights. *Stone v. Powell* at 96 S.Ct. 3048. In the instant

case, where the highest court in the state decided that the police abided by the laws in existence at the time of the wiretapping, it is not appropriate to reverse that finding, since, in the Court's words:

> "There is no reason to believe, however, that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions. Nor is there any reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk that a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant." *Stone v. Powell* at 96 S.Ct. 3051.

The exclusionary rule as a federal remedy is protected under *Stone v. Powell* by virtue of the fact that federal collateral review of the fullness and fairness of a state suppression hearing remains available. Thus, state law enforcement authorities are clearly discouraged from violating the Fourth Amendment by use of state procedures which provide no adequate forum where a defendant may litigate such claims. Petitioner Conroy was permitted to litigate his Fourth Amendment claims through three levels of state court. He now asserts that a state procedure which allows a finding of no taint, where the tapes have been destroyed, violates *Alderman*. The Second Circuit has consistently ruled otherwise. He further argues that the hearing court's rulings on cross-examination constituted abuse of discretion, although two opportunities were afforded to appeal that decision. If Petitioner were granted a new hearing, the procedures and the evidence would remain the same. The present petition, in essence, attacks the result of the state court hearing, not the process by which that result was achieved. Petitioner's distress at the result is understandable, but under *Stone v. Powell* this court's review is limited to a consideration of the process.

## *Conclusion*

Petitioner Conroy framed issues which required this court to determine whether the courts of New York had afforded him an opportunity for full and fair litigation of his Fourth Amendment claim. Conroy was entitled to no less; but under the restrictions upon habeas corpus imposed by the Supreme Court in *Stone v. Powell*, this court can do no more. After careful consideration, I am constrained to hold that Conroy's contentions on the narrow issue available to him are without merit. Accordingly I deny the Petition.

It is So Ordered.